694 A.2d 270

IDA JAMES, INDIVIDUALLY AND AS ADMINISTRATRIX AD PRO-
SEQUENDUM AND GENERAL ADMINISTRATRIX OF THE
ESTATE OF WALTER JAMES, PLAINTIFF–APPEL-
LANT/CROSS–RESPONDENT, v. CHEVRON U.S.A., INC.; SUN
COMPANY, INC.; ASHLAND CHEMICAL, INC.; MOBIL OIL
CORPORATION; NORTH AMERICAN PAINT MANUFACTUR-
ING COMPANY; PRIDE SOLVENTS & CHEMICAL CO. OF
NEW JERSEY, INC.; CITGO PETROLEUM CORPORATION;
AMOCO CORPORATION; AND DAICOLOR–POPE, INC., DE-
FENDANTS–RESPONDENTS/CROSS–APPELLANTS, AND OC-
CIDENTAL CHEMICAL CORP.; TEXACO, INC.; AMERICAN
CYANAMID COMPANY; SHELL OIL COMPANY; EXXON COR-
PORATION; AND MACARTHUR PETROLEUM & SOLVENT
COMPANY, DEFENDANTS–RESPONDENTS, AND BESSEMER
PROCESSING CO., INC.; LINDE GASES OF THE MIDLANTIC,
INC.; HOOKER CHEMICAL CO.; ROMAN HEART; BAKER
LITE CO.; MELLEN CHEMICALS, INC.; STANDARD OIL;
TEXAS OIL; AND POPE CHEMICAL, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued March 10, 1997—Decided May 27, 1997.

514

516

518

Before Judges HAVEY, KESTIN and EICHEN.

*Ronald M. Gutwirth* argued the cause for appellant/cross-respondent (*Mr. Gutwirth*, on the brief).

*James C. Orr* argued the cause for respondents/cross-appellants Exxon Corp. U.S.A., Occidental Corp., Shell Oil Co., Mobil Oil Corp., Sun Co., Inc., Ashland Chemical Inc., Texaco Inc., and North American Paint Co. (*Wilson, Elser, Moskowitz, Edelman & Dicker*, attorneys; *Carolyn F. O'Connor*, of counsel; *Susan Karlovich*, on the brief).

*Sally H. Atkins* argued the cause for respondent/cross-appellant Chevron U.S.A., Inc. (*Slowinski Atkins, LLP*, attorneys; *Matthew S. Slowinski*, of counsel; *Ms. Atkins*, on the brief).

*James J. Maron* argued the cause for respondent/cross-appellant Amoco Corporation (*McCarter & English*, attorneys; *Charles F. Rysavy*, of counsel; *Mr. Maron*, on the brief).

*Mark L. Czyz* argued the cause for respondent/cross-appellant CITGO Petroleum Corporation (*Mattson & Madden*, attorneys; *Mr. Czyz*, on the brief and joins in the briefs of defendants/cross-appellants Exxon Corp., U.S.A., Occidental Corp., Shell Oil Co., Mobil Oil Corp., Sun Co., Inc., Ashland Chemical Inc., Texaco Inc., and North American Paint Co. and respondent/cross-appellant Pride Solvents & Chemical Co. of New Jersey Inc.).

*Dean Constantine* argued the cause for respondent/cross-appellant Dailcolor–Pope, Inc. (*Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Liskowski*, attorneys; *Richard E. Arvidson*, of counsel; *Mr. Constantine*, on the brief).

*Richard M. Mandel* argued the cause for respondent/cross-appellant Pride Solvents & Chemical Co. of New Jersey, Inc. (*O'Brien, Liotta & Mandel*, attorneys; *Mr. Mandel*, of counsel and on the brief with *Marie Seitz*).

*Keith J. Miller* argued the cause for respondent American Cyanamid Co. (*Robinson, Lapidus & Livelli,* attorneys; *Steven L. Lapidus* and *Mr. Miller,* on the brief).

*Charles M. McGivney* argued the cause for respondent Macarthur Petroleum & Solvent Company [1] (*McGivney & Kluger, P.C.,* attorneys; *Mr. McGivney,* on the brief).

The opinion of the court was delivered by

HAVEY, P.J.A.D.

In this toxic-tort, failure-to-warn case, plaintiff appeals from summary judgment dismissing her survivorship and wrongful death complaint against defendants Shell Oil Company, Exxon Corporation, Amoco Corporation, CITGO Petroleum Corporation, Chevron U.S.A., Inc., Texaco, Inc., Sun Company, Inc. (Sunoco) and Mobil Oil Corporation (the Shell defendants). She also appeals from separate orders dismissing her complaint against various defendants on procedural grounds. On their cross-appeals, defendants Chevron, Texaco and the Pride defendants challenge separate orders entered in favor of plaintiff.

Plaintiff's husband, decedent Walter James (James) was exposed to benzene-containing petroleum products and other chemical substances during his twenty-six years of employment with Bessemer Processing Company, Inc. (Bessemer). He died of stomach and liver cancer in 1990. In her complaint, plaintiff claims that the Shell defendants sent numerous fifty-five-gallon drums to Bessemer for reconditioning. The drums contained residue of petroleum products manufactured by the Shell defendants. She asserts that defendants jointly and severally failed to warn of the dangerous propensities of the substances, and that James' cancer was caused by his exposure to the products.

In granting summary judgment to all defendants, the motion judge concluded that plaintiff had failed to establish that James'

---

[1] Incorrectly designated as McCarther Petroleum.

death by cancer was causally connected to a specific product manufactured by a specific defendant. We reverse the summary judgment order and remand for further proceedings.

We reverse separate orders dismissing plaintiff's complaint on procedural grounds in favor of defendants Daicolor–Pope, Inc., Macarthur Petroleum & Solvent Company, North American Paint Manufacturing Company, Texaco and Chevron. We remand for a hearing to determine whether Chevron and Texaco were prejudiced by plaintiff's untimely service of process upon them. We also reverse the order denying the Pride defendants' motion for summary judgment and remand for a hearing and findings as to whether plaintiff may utilize *R.* 4:26–4 to assert claims against these newly-identified defendants. We affirm: (1) the order dismissing the complaint against defendant American Cyanamid Company; (2) a protective order limiting the scope of discovery; and (3) the order denying plaintiff's application to amend her complaint to name additional "Amoco" defendants.

Considering plaintiff's evidentiary material submitted in opposition to summary judgment in a light most favorable to her, *see Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995), these are the facts.

James worked for twenty-six years with Bessemer at its Newark facility, performing various jobs as a general laborer. Bessemer, a subsidiary of Kingsland Drum and Barrel (Kingsland), is engaged in the reconditioning of used and empty fifty-five-gallon drums for further use by the oil industry. "Closed head" and "open head" drums were sent to Kingsland by various producers of petroleum products. Approximately thirty percent of those drums were sent thereafter to Bessemer for processing. The "open head" drums, which had removable tops and which contained stickier and more viscous residues, were sent to Bessemer because Bessemer was best equipped to remove the residue by incineration and blasting.

The drum reconditioning process first involved emptying of residue from the drums. Although, pursuant to federal regula-

tions, the "empty" drums sent by the oil producers were to have no more than one inch of residue, Bessemer employees stated in depositions that most drums contained as much as four to five gallons of waste material when received at the Bessemer plant. After the drums were "uncapped," the residue was dumped into a "slop hole" which collected beneath a conveyor. During the process, waste material spilled onto the clothing of the workers. Bessemer workers emptied the residue pit twice a month by use of shovels and buckets. James was often involved in the pit cleaning operation.

The uncapped drums were turned upside down and placed in a drag chain conveyor transporting them to a "tunnel incinerator" where the drums' residue was burned and charred by high temperature flames. According to James' co-employees, the fumes from this burning process were "strong and foul" and permeated the incinerator area. The drums were then blasted to remove all of the charred material. This process released dust and fumes into the air to which the Bessemer workers were exposed. After the reconditioning process was completed, the drums were transported back to the oil companies.

During his twenty-six years with Bessemer, James functioned as a "utility man" and "did some of everything that needed to be done," switching from position to position as the operation required. In October 1989, James was diagnosed as having stomach cancer. He died on February 8, 1990; the cause of death was "carcinoma with metastasis to the liver and peritoneum." He was fifty-two years of age at the time of his death.

Kingsland and Bessemer closed down in the early 1990's because of a lack of business. The early business records originating at Bessemer throughout James' employment were "production documents" which indicated the number of drums which had been reconditioned. These documents, however, did not indicate the name of the corporate customer which had provided the drums to Bessemer for reconditioning. All other records, kept at Kingsland, including bills of lading and billing invoices indicating the

number of drums picked up from a particular customer, did not reflect the content of the empty drums. According to Kingsland officials, all records were destroyed after being kept for three years.

Additionally, Kingsland had kept material safety data sheets presented by its customers over the years which purportedly gave warnings of and safety instructions on the potential dangers concerning the residue in the empty drums. However, these safety data sheets did not begin arriving at Kingsland until the late 1980's, around the time that James was diagnosed with stomach cancer.

After Kingsland and Bessemer ceased operations, all of the existing records pertinent to this case were destroyed by Kingsland representatives.

## I

Plaintiff first argues that the motion judge erred in granting summary judgment, since her "proofs met the required elements of a *prima facie* case against defendants Shell, Exxon, Amoco, CITGO, Chevron, Texaco, Sunoco and Mobil" (the Shell defendants).

The motion judge based his grant of summary judgment for all defendants on two grounds. First, he determined that "plaintiff's proofs fail[ed] to establish this essential element of a product liability action, namely, to identify the particular product which caused the injury." Specifically, he found:

> Although plaintiff's expert witnesses, Dr. Mehlman and Dr. Goodman, offered opinions that the cause of Mr. James' death from cancer was, in significant part, due to exposure to carcinogens which they opined were contained in the various chemicals to which decedent was exposed at Bessemer, they were unable to identify the particular products responsible for decedent's condition, the frequency, duration and extent of exposure required or incurred, or the defendants who supplied such products.

> Neither of these experts' reports provides a basis to raise a material issue of fact in respect to the causal relationship between any of the defendants and the decedent's condition. Their reports fail to identify the particular product to which the decedent was exposed. Nor do they suggest the frequency, duration and

extent of exposure necessary to constitute a significant cause of the cancer condition which led to decedent's death.

To further confound the issue, plaintiff was unable to ascertain which defendants supplied Bessemer, directly or indirectly, with drums containing specific chemical residue. Neither the kind of chemical residue, nor the amount thereof is known. Indeed, the report of Dr. Mehlman supports the conclusion that the carcinogens referred to are so widespread that there is no basis upon which a jury could conclude that any of the defendants by any view of the facts was responsible in any significant degree for the damages alleged by the plaintiff.

At the outset, it is important to stress that plaintiff focuses only on certain products produced by the Shell defendants in her argument on this point. This restriction is significant because, in our view, the evidentiary material presented by plaintiff is sufficient, at this posture of the case, to sustain a cause of action against those defendants only and not against the others.

The gravamen of plaintiff's case is that the Shell defendants failed to warn James, as a Bessemer employee, of the dangerous propensities of their petroleum products. In any products liability action, a plaintiff must first "demonstrate so-called product-defect causation—that the defect in the product was a proximate cause of the injury." *Coffman v. Keene Corp.*, 133 *N.J.* 581, 594, 628 *A.2d* 710 (1993). Where the alleged defect is a failure to provide warnings, this product-defect causation element requires the plaintiff "to prove that the absence of a warning was a proximate cause of his harm." *Ibid. See also Molino v. B.F. Goodrich, Co.*, 261 *N.J.Super.* 85, 98, 617 *A.2d* 1235 (App.Div. 1992), *certif. denied*, 134 *N.J.* 482, 634 *A.2d* 528 (1993).

The motion judge did not rest his dismissal of plaintiff's complaint on this "product-defect causation" element, perhaps because plaintiff appears to have provided *prima facie* proof of that element. A plaintiff need present only "a very low threshold of proof in order to impute to a manufacturer sufficient knowledge to trigger the duty to provide a warning of the harmful effects of its product." *Coffman, supra*, 133 *N.J.* at 599, 628 *A.2d* 710. To trigger the duty to warn, a plaintiff must show merely that "knowledge of the defect existed within the relevant industry." *Ibid.*

Here, plaintiff's expert in toxicology, Dr. Myron Mehlman, states that decades-old epidemiological studies had revealed a causative link between death from cancer and exposure to benzene and polycyclic aromatic hydrocarbons (PAHs) found in gasoline and petroleum products. He cites several studies dating back to 1928, including a 1948 report from the American Petroleum Institute, indicating that exposure to benzene was a serious health concern.

Plaintiff also provided proof that explicit warnings concerning the health dangers of residues contained in empty drums were not given to Bessemer until the late 1980's. Bessemer's environmental officer, Glenn Richard, testified at depositions that the safety information contained on the drum labels received by Bessemer increased over his eight-year career with Bessemer from 1984 to 1992, as governmental regulations required more and more disclosure. However, he acknowledged that the drum labels did not at any point in time contain as much health-related information as was present on the material safety data sheets that Richard requested and received during the late 1980's.

According to Eddie Kennedy, a Bessemer employee since 1960, prior to OSHA's[2] involvement drum labels indicated only the name of the company that sent the drum. After OSHA's intervention, Bessemer's customers applied labels to the drums indicating their content and possible health hazards associated with those contents.

In our view, all of this evidence established at least a fact question concerning the Shell defendants' duty to warn of the dangers of benzene, PAHs and other chemicals contained in the drums. Thus, there was a *prima facie* showing that the duty to warn had been breached by the Shell defendants during the period of James' working life.

---

[2] Occupational Safety and Health Administration.

■ In addition to product-defect causation, a plaintiff in products-liability litigation must demonstrate that his or her injuries "were proximately caused by exposure to defendant's ... product."[3] *Coffman, supra,* 133 *N.J.* at 594, 628 *A.*2d 710. This is known as medical causation. *See Becker v. Baron Bros.,* 138 *N.J.* 145, 152, 649 *A.*2d 613 (1994); *Sholtis v. American Cyanamid Co.,* 238 *N.J.Super.* 8, 30–31, 568 *A.*2d 1196 (App.Div.1989). To prove "medical causation," plaintiff must show "that the exposure was a substantial factor in causing or exacerbating the disease" or physical injury. *Sholtis, supra,* 238 *N.J.Super.* at 30–31, 568 *A.*2d 1196. In other words, "a plaintiff must demonstrate exposure to a defendant's product and biological processes from the exposure which result in disease." *Lineaweaver v. Plant Insulation Co.,* 31 *Cal.App.*4th 1409, 37 *Cal.Rptr.*2d 902, 906 (1995); *see also Lohrmann v. Pittsburgh Corning Corp.,* 782 *F.*2d 1156, 1162 (4th Cir. 1986); *see also Restatement (Second) of Torts,* § 431 (1965).

■ Here, plaintiff argues that she established a *prima facie* case of "medical causation" by satisfying the "frequency, regularity and proximity" test pronounced by us in *Sholtis.* There, we held that, to prove that exposure to a particular asbestos product was a substantial factor in causing the workers' asbestos disease, plaintiffs must prove "an exposure of sufficient frequency, with a regularity of contact, and with the product in close proximity" to the plaintiff. *Sholtis, supra,* 238 *N.J.Super.* at 28, 31, 568 *A.*2d 1196. *See also Coffman v. Keene Corp.,* 257 *N.J.Super.* 279, 291–92, 608 *A.*2d 416 (App.Div.1992), *aff'd,* 133 *N.J.* 581, 628 *A.*2d 710 (1993). It is not sufficient for plaintiff to have shown that the product was merely supplied to the workplace by the named defendants. *Goss v. American Cyanamid, Co.,* 278 *N.J.Super.* 227, 236, 650 *A.*2d 1001 (App.Div.1994); *Lohrmann, supra,* 782

---

[3] The *Coffman* case involved asbestos products, but a treatise suggests that the *Coffman* Court's requirement that a plaintiff prove both product-defect and medical causation extends to cases involving occupational exposure to other toxic materials as well. William A. Dreier, et al, *New Jersey Products Liability & Toxic Torts Law,* § 33.3 at 568 (Gann 1996).

*F.*2d at 1162. It must also be demonstrated that plaintiff was exposed to those products frequently, on a regular basis, and with sufficient proximity so as "to demonstrate the requisite causal connection between the exposure" and the disease plaintiff suffered. *Goss, supra,* 278 *N.J.Super.* at 236–37, 650 *A.*2d 1001. *See also Kurak v. A.P. Green Refractories Co.,* 298 *N.J.Super.* 304, 315–19, 689 *A.*2d 757 (App.Div.1997) and cases cited therein. A plaintiff's satisfaction of this "frequency, regularity, and proximity" test serves to demonstrate that the plaintiff was more than just casually or minimally exposed to a defendant's toxic product. *Sholtis, supra,* 238 *N.J.Super.* at 28–29, 568 *A.*2d 1196. Satisfaction of the test indicates "sufficiently intense exposure." *Id.* at 29, 568 *A.*2d 1196. Of course, to complete the proof of medical causation of disease or physical injury, the plaintiff must provide "competent evidence, usually supplied by expert proof, establish[ing] a nexus between the exposure and plaintiff's condition...." *Id.* at 31, 568 *A.*2d 1196.

*Sholtis* involved employee exposure to friable asbestos fibers. Thus, *Sholtis* might be read as limiting the "frequency, regularity and proximity" test to cases involving exposure to asbestos because of the cumulative nature of the effects of that exposure. *Id.* at 29–30, 568 *A.*2d 1196.

■ Nevertheless, at least for summary judgment purposes, we are convinced that the *Sholtis* analysis is relevant to the "medical causation" issue in a toxic-tort case, such as this, involving occupational exposure to cancer-causing substances manufactured by a determinant number of defendants, all of whom, it is alleged, acted tortiously by failing to warn of the dangerous propensities of their products.

We recognize that the dynamics and causative effects of exposure to asbestos dust may differ from the disease process resulting from exposure to chemicals containing known carcinogens. However, these differences should not cause rejection of the "frequency, regularity and proximity" model. Based on circumstantial evidence, the jury may find in any toxic-tort case, that a

plaintiff in the workplace was exposed to the cancer-causing products of defendant-manufacturers on many occasions, and that the exposures were a substantial factor in causing plaintiff's cancer. Application of the "frequency, regularity and proximity" test necessarily focuses on the cumulative effects of exposure to the carcinogen over a prolonged period of time, the dosage of exposure and mode of absorption into the human body. Bernard D. Goldstein and Mary Sue Henifin, *Reference Manual on Sci. Evid.* 181 (Federal Judicial Center 1994). "Since proof of direct contact is almost always lacking, especially in bystander cases, courts must rely upon circumstantial proof of sufficiently intense exposure to warrant liability." *Sholtis, supra,* 238 *N.J.Super.* at 29, 568 *A.*2d 1196. Whether the claim is asbestosis or stomach cancer, the frequency, regularity and proximity of exposure will be an important and fundamental factual link in plaintiff's experts' analysis and methodology in reaching an ultimate theory of medical causation.[4]

Moreover, the modern trend has been to relax or broaden the standard for determining medical causation in toxic-tort litigation. *See Landrigan v. Celotex Corp.,* 127 *N.J.* 404, 413, 605 *A.*2d 1079 (1992); *Rubanick v. Witco Chem. Corp.,* 125 *N.J.* 421, 434, 593 *A.*2d 733 (1991) (and authorities cited therein); *Ayers v. Township of Jackson,* 106 *N.J.* 557, 585, 525 *A.*2d 287 (1987); and *see*

---

[4] A Pennsylvania appellate court has held that the asbestos "frequency and regularity" model is applicable to a determination of the sufficiency of a complaint seeking damages for alleged exposure to carcinogens, in that case cadmium. *Jobe v. W.P. Metz Refining,* 445 *Pa.Super.* 76, 664 *A.*2d 1015, 1020 (1995), *appeal denied,* 544 *Pa.* 659, 676 *A.*2d 1199 (1996). The plaintiff must show that the employee-decedent was at a particular worksite; that he was exposed to carcinogenic-containing products at the site; and that defendants' carcinogenic-containing products was at that particular worksite at or about the same time as the decedent. *Id.,* 664 *A.*2d at 1019. In *Jobe,* the court rejected plaintiff's "frequency and regularity" argument because " '[a]bsent testimony of record that identifies [defendants'] products as being present in the [vicinity in which decedent worked], there is not even a reasonable inference that [decedent] was exposed to [defendants' cadmium] products.' " *Id.,* 664 *A.*2d at 1020 (quoting *Bushless v. GAF Corp.,* 401 *Pa.Super.* 351, 585 *A.*2d 496, 503 (1990), *appeal quashed,* 532 *Pa.* 604, 616 *A.*2d 1375 (1992)).

*Daubert v. Merrell Dow Pharm.*, 509 *U.S.* 579, 591–92, 113 *S.Ct.* 2786, 2796–97, 125 *L.Ed.*2d 469, 482–83 (1993); Gerald W. Boston, *Toxic Apportionment: A Causation Risk Contribution Model*, 25 *Envtl. L.* 549 (1995); Susan R. Poulter, *Science and Toxic Torts: Is There a Rational Solution to the Problem of Causation?*, 7 *High Tech. L.J.* 189 (1992). In the toxic-tort context, "proof that a defendant's conduct caused decedent's injuries is more subtle and sophisticated than proof in cases concerned with more traditional torts." *Landrigan, supra,* 127 *N.J.* at 413, 605 *A.*2d 1079. A less traditional standard is essential because, unlike the typical personal injury action (where the connection between the conduct of the defendant and injury to the plaintiff is readily deducible) the toxic-tort case often involves, as here: (1) distribution of the offending substance by several manufacturers; (2) exposure of long duration, chronic and repeated; and (3) harm normally resulting from genetic or biochemical disruption rather than trauma or acute toxic response. *See Elam v. Alcolac, Inc.*, 765 *S.W.*2d 42 (Mo.Ct. App.1988), *cert. denied,* 493 *U.S.* 817, 110 *S.Ct.* 69, 107 *L.Ed.*2d 36 (1989). Application of the "frequency, regularity and proximity" test to occupational exposure cases other than asbestos litigation is consistent with this modern trend. It accommodates the plaintiff who may otherwise be unable to establish causation based on traditional tort concepts, and the defendants by demanding proof greater than a single or casual exposure to the offending product.

Here, if we credit plaintiff's proofs, we have direct and circumstantial evidence that James was regularly and frequently exposed to petroleum products sent to Bessemer by the Shell defendants. James' co-employees recognized drums from these defendants at the worksite during James' twenty-six years of employment which "always" contained gasoline and oil residue. Co-employee Kennedy saw Texaco drums at Bessemer "frequently" up until the last four years of Bessemer's operation. They contained oils, black oils and gasoline. Some of the Bessemer employees used the gasoline to operate their personal cars. He also identified Exxon, Mobil, Sunoco, Shell, CITGO, Amoco and Chevron, as frequent suppliers of drums containing oil and "black" oil residue.

Another Bessemer employee, Daniel Stewart, observed drums from Shell, Exxon, Chevron, Texaco, Mobil and Sunoco, which contained gasoline and motor oil. He estimated that many drums contained four to five gallons of residue, and stated that the fumes from the drums were always present during the Bessemer operation.

Co-employee Roosevelt Lewis testified that drums from all of the Shell defendants were present at Bessemer "every day" over his twenty-three years at the plant, and that those drums contained residues of light and dark oils, gasoline, and antifreeze. He recognized the gasoline and oil residues by their smells. Thomas Mewborn, a Bessemer employee from 1977 until 1992, observed that the fumes from the drums sent by Exxon, Shell, Texaco and CITGO, were "pretty strong" and that they contained "quite a bit of residue" at times.

Further, Irving Klein, president of both Kingsland and Bessemer, testified that Kingsland's three "biggest" customers were Texaco, Exxon and Shell and that these companies, along with CITGO, Mobil and Sunoco, represented the majority of Kingsland's business. Glenn Richard stated that as many as 150,000 drums per year were being sent to Bessemer during peak years, with 1,200 drums being reconditioned on a "good day." Richard also conceded that from 1984 to 1992, Bessemer reconditioned drums sent by all of the Shell defendants.

As stated, much of the residue from the drums was dumped into a "slop hole" which was cleaned by Bessemer employees. The uncontradicted evidence is that James regularly cleaned out the "slop hole" and was involved in every other aspect of the Bessemer reconditioning process during his employment with Bessemer. Thus, the evidence supports plaintiff's claim that James was physically exposed to the products and the fumes emanating from the reconditioning process frequently and regularly throughout his employment years. When this showing of James' work activities is coupled with the evidence indicating that a large portion of residue-containing drums received by Bessemer were from all the

Shell defendants, plaintiff makes a *prima facie* showing that James was frequently and regularly in close proximity to the gasoline, motor oil, and black oil residues contained in the drums sent by those defendants. Accordingly, plaintiff satisfied the "frequency, regularity and proximity" test for purposes of defeating summary judgment against her.

*Becker, supra,* 138 *N.J.* at 145, 649 *A.*2d 613, cited by both the motion judge and the Shell defendants, is inapposite. There, the Supreme Court reversed the Appellate Division's ruling that any friction product containing asbestos is defective if it does not contain a warning. *Id.* at 154, 649 *A.*2d 613. The "primary flaw" found in the Appellate Division's analysis was its assumption that all asbestos products are dangerous and unsafe. *Ibid.* According to the Court, the problem with the Appellate Division's analysis was that it ignored the evidence in the case that "different types of asbestos pose different health hazards." *Ibid.* During trial there were competing opinions rendered by the experts as to whether the asbestos product in question, processed chrysotile, posed a risk of causing mesothelioma in the users of the product. *Id.* at 154–56, 649 *A.*2d 613. Confronted with the experts' disagreement, the Court held that the trial judge should have permitted the jury to resolve the disputed issue of fact in respect of the dangers of the asbestos product involved in the case. *Id.* at 158–59, 649 *A.*2d 613.

*Becker* is distinguishable because it holds that when there is competing expert testimony concerning the harmfulness of a product, the jury must decide the issue. The holding, however, is predicated on the defendants presenting expert proof during trial that the product does not pose a danger. Here, the case was dismissed on summary judgment when the only medical evidence before the motion judge was plaintiff's experts' reports stating unequivocally that the petroleum products manufactured by the Shell defendants contained benzene and PAHs, known carcinogens.

■ Ultimately, of course, in order to establish a *prima facie* case of medical causation, plaintiff must come forward with scientific and/or medical proof that the petroleum products shipped to the Bessemer workplace by the Shell defendants caused James' stomach and liver cancer. We reject the motion judge's observation that plaintiff failed to prove "product identification"; that is, plaintiff's experts "were unable to identify the particular products responsible for decedent's condition" and "fail[ed] to identify the particular product to which the decedent was exposed."

Plaintiff's toxicologist, Dr. Mehlman, who had worked in the petroleum industry for 12 years, concluded that James' cancer was caused by exposure during his twenty-six years of employment to various petroleum products which contained benzene, toluene, xylene, ethyl benzene, acrylonitrile, formaldehyde, PAHs and light cat-cracked naphtha. He stated:

> In spite of the fact that the chemical compositions of many of the substances identified by Bessemer as being present in the drums were not provided, *I was still able to identify many chemicals and products to which Mr. James was exposed through testimony of his co-workers and through several of the Material Safety Data Sheet ("MSDS") provided by Shell Oil and Exxon.* Some of these chemicals and products which I was able to identify include: black oils, motor oils, polycyclic aromatic hydrocarbons (PAHs), solvents, and formaldehyde. Furthermore, many of the MSDSs provided by Exxon indicate that numerous products contained extremely high levels of benzene and PAHs.

[ (Emphasis added).]

Dr. Mehlman relied heavily on the depositions and statements offered by James' co-employees, establishing that the drums sent to Bessemer contained gasoline, oils, and black oils. As to these petroleum products, Dr. Mehlman focused primarily on benzene and PAHs, both known carcinogens, found in the type of residue sent to Bessemer by the Shell defendants.

Dr. Mehlman then explained the mechanics of benzene and PAH toxicity and, by reference to epidemiological studies, presented substantial data concerning excess human cancers in workers exposed to benzene and PAHs. The epidemiological studies, were, according to Dr. Mehlman, scientifically accepted methodologies for determining cancer in humans. One study, dated as

early as 1948, reported that "inasmuch as the body develops no tolerance to benzene and there is a wide variation in individual susceptibility, it is generally considered that the only absolutely safe concentration for benzene is *zero.*"

It was Dr. Mehlman's belief that the studies of refinery workers on which he relied involved exposures to benzene and PAHs which were the equivalent of James' exposures. He stated to a reasonable degree of scientific and medical probability that "the chemicals to which Mr. James was exposed penetrated his cells, became activated by being metabolized with the liver or other organs, and then reacted with his genetic material by forming adducts with his DNA." Notably, he also stated that although he did not have the chemical composition of the precise chemicals described by James' co-workers, the physical descriptions of the chemicals demonstrated that the products contained sufficiently high levels of benzene and PAHs to cause decedent's cancer and ultimate death.

Dr. Rowland Goodman, an internist, stated in his report that, on the basis of the information submitted to him concerning James' exposure to petroleum products from 1960 to the mid–1980's, James' death was causally related to his exposure to carcinogens and mutagens in the petroleum substances. It was his view that James had absorbed the benzene through his gastrointestinal tract and lungs. The chemicals then spread to his stomach causing a "derangement" of the DNA mechanism. As a result, one or more cells grew in "an uncontrolled fashion clinically known as a cancer."

Thus, contrary to the motion judge's view, the offending products were sufficiently identified, as least as far as the Shell defendants were concerned, to overcome defendants' summary judgment motion.

■ The opinions of both Dr. Mehlman and Dr. Goodman must, of course, be examined during an *N.J.R.E.* 104 hearing before being admitted into evidence. Dr. Mehlman, for example, should be permitted to explain the mechanics of benzene and PAH

toxicity in support of his conclusion that the petroleum products manufactured by the Shell defendants were a substantial factor in causing James' death. The focus will be on the data relied on, his methodology, and the reasoning supporting his testimony. *Rubanick, supra*, 125 *N.J.* at 449, 593 *A.*2d 733. The admissibility of his testimony and ultimate conclusions will depend on his ability to "explain pertinent scientific principles and to apply those principles to the formulation of his ... opinion. Thus, the key to admission of the opinion is the validity of the expert's reasoning and methodology." *Landrigan, supra*, 127 *N.J.* at 414, 605 *A.*2d 1079.

The expert must also identify the factual bases for his conclusions and "demonstrate that both the factual bases and the methodology are scientifically reliable." *Id.* at 417, 605 *A.*2d 1079. Moreover, if epidemiological studies are to provide the bases for the expert's opinion, they must be " 'soundly and reliably generated' and be 'of a type reasonably relied on by comparable experts in the particular field.' " *Landrigan, supra*, 127 *N.J.* at 419–20, 605 *A.*2d 1079 (quoting *Rubanick, supra*, 125 *N.J.* at 447, 593 *A.*2d 733). *Cf. Daubert, supra*, 509 *U.S.* at 593–94, 113 *S.Ct.* at 2796–97, 125 *L.Ed.*2d at 482–84 (in considering whether expert scientific testimony should be admitted in a toxic-tort case, trial judge should consider such factors as: (1) whether the theory in question can be tested; (2) whether it has been subjected to peer review; (3) the theory's known or potential error rate; (4) the existence and maintenance of standards controlling its operation; and (5) whether the theory has attracted widespread acceptance within a relevant scientific community).

We need only state here that the motion judge erred in dismissing summarily the experts' opinions concerning causation without applying this "gate-keeping" role in determining whether the opinions are sufficiently reliable to be admitted into evidence.

In summary, we are satisfied that plaintiff presented sufficient proof of frequency, regularity and proximity and medical causation to defeat the Shell defendants' motion for summary judgment.

## II

Plaintiff also argues, relying on *Sholtis*, that the Shell defendants should be held jointly and severally liable and that the burden should shift to them to apportion liability. *Sholtis* adopts the reasoning of the Fifth Circuit in *Borel v. Fibreboard Paper Products Corp.*, 493 *F*.2d 1076, 1094 (5th Cir.1973), *cert. denied*, 419 *U.S.* 869, 95 *S.Ct.* 127, 42 *L.Ed.*2d 107 (1974), which held that where there is "strong circumstantial evidence" of exposure to all of the defendant-manufacturers' asbestos products, on many occasions, either the simultaneous or cumulative negligence results in joint and several liability unless the defendants are able to apportion liability. *Ibid.; Sholtis, supra*, 238 *N.J.Super.* at 27, 568 *A*.2d 1196.

Here, if plaintiff's case goes to the jury solely against the Shell defendants, plaintiff should not be prevented from arguing that the *Sholtis/Borel* model applies in this case. As in the asbestos cases, here it is impossible as a practical matter to determine with certainty that James was exposed to a specific petroleum product manufactured by a specific Shell defendant, and that that exposure caused his cancer. But the facts, at least at this point, establish that James suffered an indivisible injury which was "the product of a gradual process contributed to by multiple parties." *Goodman v. Fairlawn Garden Assocs.*, 253 *N.J.Super.* 299, 304, 601 *A*.2d 766 (App.Div.), *certif. denied*, 130 *N.J.* 7, 611 *A*.2d 647 (1992). Where there is "unitary injury caused by concurrent negligence, the plaintiff is naturally relieved of this burden [of proving apportionment] because of the joint liability which is the usual concomitant of concurrent negligence." *Id.* at 306, 601 *A*.2d 766.

Fairly read, the medical proofs establish that James' cancer was caused by carcinogens contained in petroleum products found in the residue of the drums sent to Bessemer. As we understand plaintiff's appellate brief, she focuses solely on the evidence establishing that the offending products were presented to the workplace by the Shell defendants.

If, after plaintiff's proofs are ultimately distilled by pretrial motions and evidence during trial, her ultimate claim is against a determinate number of petroleum product manufacturers, the jury, by way of special interrogatories may be asked whether: (1) James was exposed to petroleum products placed in the Bessemer workplace by each of the Shell defendants; (2) the exposure to each of the products was frequent and regular, with James in close proximity to the products over a prolonged period of time; and, if so, (3) whether, based on admissible expert testimony, the exposure was a substantial factor in causing James' cancer. If the answers to those questions are in the affirmative, each petroleum product may be deemed a cause in fact of James' disease. In that case the culpable defendants should be deemed jointly and severally liable and the burden would shift to them to apportion fault.[5]

---

[5] In toxic-tort chemical exposure cases, courts in other jurisdictions have analyzed the joint and several liability and apportionment questions in the context of the alternative liability theory under the *Restatement, supra,* § 433B(3). That section provides:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

*See Fiorella v. Ashland Oil, Inc.,* 92 *Ohio App.*3d 411, 635 *N.E.*2d 1306 (1993) (alternative liability theory inapplicable because several manufacturers who had supplied benzene products to workplace had not been joined as defendants in the action). *Contra Jackson v. Glidden Co.,* 98 *Ohio App.*3d 100, 647 *N.E.*2d 879, 883–84 (1995) (where plaintiffs are unable to identify which defendant manufactured paint that caused plaintiffs' injuries, but defendants produced substantially all of the lead paint causing the injuries, plaintiffs' stated cause of action based on alternative liability even though all of potential defendants had not been joined in the action). *See also Shackil v. Lederle Labs.,* 116 *N.J.* 155, 166, 561 *A.*2d 511 (1989); *Namm v. Charles E. Frosst & Co., Inc.,* 178 *N.J.Super.* 19, 31–33, 427 *A.*2d 1121 (App.Div.1981). In our view, § 433B(3) is inapplicable here because plaintiff does not claim that the harm caused to James was caused "by only one of [the defendants], but there is uncertainty as to which one has caused it. . . ." She claims that, applying the frequency, regularity and proximity test, all of the Shell defendants were concurrently liable and that their collective fault caused James' death.

Presently, however, the picture is not sufficiently focused to hold that the *Sholtis* jury instruction should be given. Plaintiff has asserted claims against other defendants who manufactured non-petroleum products such as resins, paint thinner and dyes, claiming that James' exposure to these products was a substantial factor in causing his death. No expert evidence has yet been introduced demonstrating that these substances proximately caused James' illness. Further, no "frequency, regularity or proximity" analysis has been made concerning these products. Finally, it is unclear whether introduction of these non-petroleum products into the mix will alter plaintiff's medical proofs as to causation in fact. If these substances remain in the case as causes of James' cancer, the trial judge must decide whether to accept or reject the jury instruction under *Sholtis* or any other collective liability theory before the matter is presented to the jury. *See Restatement, supra,* § 433A.[6]

### III

In his written opinion, the motion judge advanced a secondary ground in support of dismissal of plaintiff's case. He posed the question: "[D]oes the imposition of liability in the circumstances impose an unreasonable burden upon the defendant[s]?" and answered the question in the affirmative on public policy grounds, concluding that all defendants were "innocent" of any conduct causing James' death and that "the only culpable party in this case is Bessemer." In our view, the judge was mistaken because the evidentiary material presented a jury question whether the actions of Bessemer's managers constituted a

---

[6] Comment i. to § 433A provides in part:

Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm.

supervening cause of James' death sufficient to relieve the Shell defendants from liability for failure to warn.

In an employment setting, a manufacturer's duty to warn of its product's dangers extends to both employers and employees because both groups are foreseeable users of the product. *Coffman, supra,* 133 *N.J.* at 607–08, 628 *A.*2d 710. Moreover, because the "heeding presumption" applies to both employers and employees, it may be presumed that an employer would have heeded a warning concerning a product, if such a warning had been given by a manufacturer. *Id.* at 608, 628 *A.*2d 710; *see also Theer v. Philip Carey Co.,* 133 *N.J.* 610, 622, 628 *A.*2d 724 (1993). In order to prove a supervening cause and

> to overcome the heeding presumption, the manufacturer must show that had an adequate warning been provided, the employer itself would not have heeded the warning by taking reasonable precautions for the safety of its employees and would not have allowed its employees to take measures to avoid or minimize the harm from their use or exposure to the dangerous product.
>
> [*Coffman, supra,* 133 *N.J.* at 609, 628 *A.*2d 710.]

Essentially, the motion judge found as a matter of law that Bessemer alone was culpable and thus solely responsible for James' death. In our view, this determination was erroneous because there was conflicting evidence concerning Bessemer's possible reaction to adequate warnings about the health dangers inherent in drum residues, had such warning been given by defendants.

On the one hand there is Bessemer's long-standing history of lackadaisical enforcement of safety rules, especially where the handling of drum residues was concerned. On the other hand, there is evidence that, after Bessemer was pressured by the federal OSHA in the late 1980's, it conducted safety classes for its employees and demanded and received material safety data sheets from its customers describing the possible residues present in the customers' empty drums, including the health dangers presented by those residues.

Consequently, there is at least a fact issue as to whether, if defendants had timely warned Bessemer concerning the health

dangers inherent in their drum residues, Bessemer would have taken precautions to protect its employees, including James. The fact-finder may conclude that the Shell defendants did not provide the crucial material safety data sheets to Bessemer until the late 1980's, about the time James left his employment for health reasons. In these circumstances, the evidence, viewed in a light most favorable to plaintiff, *R.* 4:46–2; *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146, raises genuine fact issues as to whether Bessemer was the only "culpable" party in this case.

### IV

■ We are satisfied that summary judgment was properly granted to American Cyanamid Company. Plaintiff challenges the order based on the testimony of various Bessemer employees indicating that "formaldehyde was regularly received at Bessemer" and that "American Cyanamid provided formaldehyde drums to Kingsland for twenty six years."

The problem with plaintiff's argument is that there is a missing link in the evidence supporting it. There is no evidence showing that any of the formaldehyde drums sent by American Cyanamid to Kingsland were ever transferred to Bessemer for reconditioning. Thus, although the employees may have indicated that formaldehyde was present at the worksite, there are no facts from which a reasonable inference could be drawn that the substance was received from American Cyanamid. Plaintiff attempts to bridge this evidential gap by raising an inference that some of American Cyanamid's formaldehyde drums probably were transferred by Kingsland to Bessemer because thirty percent of Kingsland's business was performed by Bessemer. However, this evidence is too inconclusive to support such an inference. Summary judgment was therefore properly granted to American Cyanamid.

### V

■ Plaintiff next argues that summary judgment should not have been granted to defendants Daicolor–Pope, Inc. (Daicolor),

Macarthur Petroleum & Solvent Company (Macarthur) and North American Paint Company (North American) because she had not completed discovery concerning whether they had sent drums of petroleum products or other toxic substances to the Bessemer site. We agree.

The problems concerning these defendants evolve from the procedural history. On May 23, 1994, plaintiff amended her complaint naming North American, Daicolor and Macarthur, as additional defendants. A protective order dated July 29, 1994, limited plaintiff's discovery, but that order did not apply to these defendants. Plaintiff's attorney appears to have mistakenly assumed that the order applied and, as a result, conducted almost no discovery concerning these defendants in the five-month period between her filing of the amended complaint and the summary judgment dismissing the complaint as to all defendants.

Preliminary discovery, however, had disclosed that North American had provided paints to Bessemer in 1987 and 1989, and indicated the potential for dangerous chemical emissions from these paints. The record also contained testimony that James in fact had applied the paint to reconditioned drums. Thus, there was evidence in the record that James had been exposed to paint emissions from North American's paints while working at Bessemer. The missing link, of course, is the absence of any · expert opinion concerning James' exposure to these paint emissions and his cancer. As noted, Dr. Mehlman's report was essentially confined to the carcinogenic effects of exposure to petroleum products.

█ It is especially "inappropriate" to grant summary judgment when discovery is incomplete and when critical facts are peculiarly within the moving party's knowledge. *Velantzas v. Colgate–Palmolive Co., Inc.*, 109 *N.J.* 189, 193, 536 *A.*2d 237 (1988). The limited discovery here demonstrates North American's role as a paint supplier to Bessemer. Further discovery from North American itself may reveal that it has extensive records showing the amounts and types of paint supplied to

Bessemer, the length of time over which it supplied paint, the chemical composition of the supplied paints, any health warnings submitted by it and other pertinent information. This data may or may not provide Dr. Mehlman with a basis to render a medical-causation opinion concerning North American's conduct and James' exposure to its product. Simply put, because discovery was incomplete, summary judgment in favor of North American should not have been granted.

The same is true with respect to Daicolor and Macarthur. There is evidence that Daicolor sent residue-containing drums to Bessemer while Macarthur sent both drums and chemical solvents. Yet, no meaningful discovery concerning these defendants was conducted, apparently because of counsel's misperception as to the scope of the protective discovery order. In light of the incomplete discovery and the undeveloped nature of plaintiff's case against Daicolor and Macarthur, we are satisfied that the grant of summary judgment in their favor was premature under the *Velantzas* rationale.

Another difficulty concerning Daicolor and Macarthur is that although they had been served prior to the motion judge's oral grant of summary judgment dismissing as to all defendants, neither had yet filed an answer. Following the judge's oral opinion dismissing as to "all the defendants in the case," he granted Daicolor's application to have Daicolor included in the summary judgment. Plaintiff's counsel later inquired whether "[o]n the basis of consent," Macarthur should also be included in the summary judgment order. The judge answered in the affirmative and added Macarthur to the order dismissing plaintiff's complaint. Daicolor and Macarthur now argue that plaintiff consented to the summary judgment against them and thus may not appeal from that judgment. We do not agree.

It is true that an appeal will not lie from an order made with the consent of the party appealing from it. *See Infante v. Gottesman,* 233 *N.J.Super.* 310, 318, 558 *A.*2d 1338 (App.Div. 1989); *see also Mack Auto Imports v. Jaguar Cars, Inc.,* 244

*N.J.Super.* 254, 256, 581 *A.2d* 1372 (App.Div.1990). However, here, we note again that plaintiff's attorney's consent was based in part on his misperception that the protective discovery order applied to Daicolor and Macarthur. "[I]n the absence of demonstrable prejudice to the other party it is neither necessary nor proper to visit the sins of the attorney upon his blameless client." *Jansson v. Fairleigh Dickinson Univ.*, 198 *N.J.Super.* 190, 196, 486 *A.2d* 920 (App.Div.1985). Here, plaintiff is blameless. Moreover, Daicolor and Macarthur cannot show "any demonstrable prejudice" will result from reinstating plaintiff's cause of action against them.

It may be that, upon completion of discovery, plaintiff will not be able to satisfy the "frequency, regularity and proximity" test as to North American's, Daicolor's and Macarthur's products to establish a *prima facie* case of causation. That issue has not yet been addressed.

## VI

Plaintiff next argues that the trial judge erred in granting summary judgment to Chevron and Texaco on the basis that they had been prejudiced by plaintiff's more than two-year delay in serving process upon them. In our view, a remand for a hearing on the prejudice issue is necessary.

This is the pertinent procedural history. On February 7, 1992, plaintiff filed her original complaint against Chevron and Texaco, as well as other defendants. However, summonses were not served upon Chevron and Texaco until April 8 and May 18, 1994, respectively, more than twenty-six months after the original complaint was filed. Chevron and Texaco's initial motion to dismiss based on the untimeliness of service was denied. However, the judge indicated that they could renew the motion if they could show prejudice because crucial evidence had been destroyed or lost by Bessemer between the filing of the original complaint and the service of process. The "crucial evidence" was the corporate records of Bessemer and Kingsland that had in fact been de-

stroyed when the corporations closed their operations in June 1992.

Chevron and Texaco renewed their motion on July 19, 1994. Relying on *R.* 4:4–1 and *R.* 4:37–2(a), the motion judge dismissed the complaint against the two defendants, determining that they had been prejudiced by the destruction of Kingsland's and Bessemer's corporate records during the twenty-six month period that service of process had been delayed.

Plainly, the destroyed records may have indicated how many drums Chevron and Texaco sent for reconditioning, when they sent those drums, and what proportion of the total number of drums annually reconditioned was attributable to Chevron and Texaco. That information goes to the heart of the "frequency, regularity and proximity" test and would have had a direct bearing on proving or disproving plaintiff's case against Chevron and Texaco. Additionally, the destroyed customer lists may have provided the identities of all possible senders of drums, thus providing Chevron and Texaco with a factual basis to establish that James' death was attributable to drum residues from some other source.

The problem is that the certifications of Klein and Richard, Bessemer's president and environmental officer, respectively, relied on by the motion judge, did not indicate the time frame for the documents Bessemer allegedly destroyed. It appears from the certifications that the records were destroyed sometime between June 1992 and January 26, 1994. The records destroyed, however, were only for a limited period of time. Klein testified in his deposition that the records destroyed after June 1992 only covered the period beginning in 1990. Thus, there is an open question whether the records destroyed during the delay in service were relevant to the time periods of James' employment. There is therefore a question whether Chevron and Texaco were really prejudiced by the destruction of those records. In other words, the truly pertinent records may have been destroyed *before* plaintiff had filed her original complaint in 1992.

"Ordinarily, in the absence of demonstrable prejudice to the defendant, a complaint should not be dismissed because of untimely issuance of a summons." *State v. One 1986 Subaru,* 120 *N.J.* 310, 315, 576 *A.*2d 859 (1990). We remand for a hearing concerning the time period covered by the destroyed records for a meaningful determination as to whether in fact Chevron and Texaco were prejudiced by the untimely issuance of the summonses.

## VII

We are satisfied that entry of the protective order precluding plaintiff from discovering additional information concerning defendants' chemical manufacturing operations was a sound exercise of the motion judge's discretion. Plaintiff requested information concerning thousands of drummed chemical products produced by defendants over the twenty-six year period of James' employment with Bessemer. Her discovery demand was burdensome and to some extent illogical because it focused on defendants' total production of drummed chemicals, rather than on Bessemer's receipt of drums for reconditioning. *See R.* 4:10–3. Plaintiff's "law of the case" contention based on a prior discovery order entered by another judge is unpersuasive. The doctrine should be applied flexibly insofar as interlocutory discovery orders are concerned to serve the interests of justice. *Sisler v. Gannett Co., Inc.,* 222 *N.J.Super.* 153, 159, 536 *A.*2d 299 (App.Div.1987), *certif. denied,* 110 *N.J.* 304, 540 *A.*2d 1283 (1988).

## VIII

Likewise, we are satisfied that the motion judge's denial of plaintiff's post-summary judgment motion to amend her complaint to include other "Amoco" entities as defendants, was not an abuse of discretion. *See Fox v. Mercedes–Benz Credit Corp.,* 281 *N.J.Super.* 476, 483–84, 658 *A.*2d 732 (App.Div.1995).

## IX

On its cross-appeal, Chevron argues that the judge erred when he dismissed the complaint against it without prejudice, rather than with prejudice. As stated, the dismissal was based on the twenty-six month delay in plaintiff's issuance of the summons against Texaco.

The judge dismissed the complaint as to Chevron *without* prejudice because "that is what the rule [*R*. 4:37–2(a) ] provides." Chevron now reasons that the prejudice it suffered as a result of the destruction of the records during the twenty-six month delay in serving summonses could only be cured by the dismissal of the complaint with prejudice.

The decision whether to dismiss with or without prejudice under *R*. 4:37–2(a) is reposed in the sound discretion of the trial court. *Crispin v. Volkswagenwerk, A.G.*, 96 *N.J.* 336, 346, 476 *A*.2d 250 (1984). Since the question whether Chevron's defense was compromised by the twenty-six month delay in service will be revisited on remand, we need not now address the contention.

## X

On its cross-appeal Pride Solvents & Chemical Co. (Pride) argues that the motion judge erred in denying the "Pride" defendants' joint motion for summary judgment. The seven "Pride" defendants—Ashland Chemical Co., Inc., Mobil, North American, Sunoco, CITGO, Amoco and Daicolor, join in Pride's argument that "because plaintiff's amended complaint naming Pride as a defendant pursuant to *R*. 4:26–4, does not 'relate back' to the filing of the original complaint [, the amended complaint is] barred by the applicable statutes of limitation."

Plaintiff's original complaint, filed on February 7, 1992, did not name the Pride defendants as party-defendants. However, plaintiff did name 200 "John Doe" defendants in the complaint. Subsequently, on May 23, 1994, plaintiff filed an amended complaint naming the Pride defendants. By the time plaintiff filed this

amended complaint, the two-year statutes of limitation had expired for plaintiff's wrongful death and survivorship claims. *See* *N.J.S.A.* 2A:31–3; *N.J.S.A.* 2A:14–2.

On August 12, 1994, Pride filed its initial motion to dismiss the amended complaint based on the time-bar argument and application of the fictitious name procedure under *R.* 4:26–4. It asserted that dismissal was necessary because Kingsland and Bessemer had destroyed crucial records and "witnesses memories have faded" during the time since plaintiff filed her original complaint. According to Pride, if plaintiff were allowed to pursue her amended complaint against Pride, she would be unjustly benefitted and Pride unfairly prejudiced by the destruction of those records by Kingsland and Bessemer. The motion judge did not then decide the issue.

On October 7, 1994, following the oral grant of summary judgment as to all defendants based on plaintiff's purported failure to present a *prima facie* case, the judge turned his attention to Pride's pending dismissal motion. By that time, the other Pride defendants had joined in the motion. The judge determined that plaintiff had properly availed herself of the fictitious-name procedure set out in *R.* 4:26–4, and that her amended complaint did "relate back" to the filing date of her original complaint. Without comment, the motion judge rejected Pride's attorney's reminder that it alleged prejudice by commenting "I understand that."

Our Supreme Court has construed *R.* 4:26–4 to permit a plaintiff who institutes a timely action against a fictitious defendant to amend the complaint to identify the true defendant after the expiration of the statute of limitations. *Viviano v. CBS, Inc.*, 101 *N.J.* 538, 548, 503 *A.2d* 296 (1986). The Court stated that "an amended complaint identifying the defendant by its true name relates back to the time of filing of the original complaint, thereby permitting the plaintiff to maintain an action that, but for the fictitious-party practice, would be time-barred." *Ibid.*

 *Viviano* recognizes that *R.* 4:26–4 "emanate[s] from our attempt to balance the defendant's interest in repose with the plaintiff's interest in a just determination of his or her claim." *Id.* at 547, 503 *A.*2d 296. Particularly, as here, where the case involves an industrial accident, the need to "submit claims promptly to judicial management must be tempered by the policy favoring the resolution of claims on their merits" *Ibid.*

 Our Supreme Court in *Farrell v. Votator Div. of Chemetron Corp.,* 62 *N.J.* 111, 115, 299 *A.*2d 394 (1973), set forth the pertinent standard in determining whether plaintiff may amend a complaint to identify the true defendant after expiration of the statute of limitations. It stated:

> When a plaintiff knows or has reason to know that he has a cause of action against an identifiable defendant and voluntarily sleeps on his rights so long as to permit the customary period of limitations to expire, the pertinent considerations of individual justice as well as the broader considerations of repose, coincide to bar his action. Where, however, the plaintiff does not know or have reason to know that he has a cause of action against an identifiable defendant until after the normal period of limitations has expired, the considerations of individual justice and the considerations of repose are in conflict and other factors may fairly be brought into play.
>
> [*Ibid.*]

*See also Marion v. Borough of Manasquan,* 231 *N.J.Super.* 320, 334–35, 555 *A.*2d 699 (App.Div.1989). *Farrell* also suggests that if, because of the lapse of time, there has been a "loss of evidence" or "impairment of ability to defend," these factors are to be considered in determining whether a plaintiff may utilize *R.* 4:26–4 to assert a claim against the newly-identified defendant. 62 *N.J.* at 122, 299 *A.*2d 394.

Here, the motion judge made no analysis applying the *Viviano/Farrell* factors. Plaintiff's reply brief presents a persuasive argument that she and her counsel exercised reasonable diligence attempting to determine the identity of all culpable defendants who may have presented offending products to the Bessemer workplace prior to and after the filing of her original complaint. She states that her efforts were inhibited by the reluctance or refusal of Bessemer officials to produce salient records that may

have led to an earlier identification of all culpable parties. These facts, if undisputed, present a compelling case in favor of permitting plaintiff to pursue her amended complaint.

However, the motion judge must also consider whether the Pride defendants' ability to defend has been impaired by the lapse of time. The question is whether the relation-back procedure under *R.* 4:26–4 in plaintiff's favor will result in such "perceivable undue prejudice," to defendants that plaintiff's relation-back argument must be rejected despite the equities in her favor. *Hernandez v. St. James Hosp.*, 214 *N.J.Super.* 538, 543, 520 *A.2d* 773 (App.Div.1986).

As to the prejudice issue, the Pride defendants claim that they have suffered precisely the same type of "prejudice" purportedly suffered by Chevron and Texaco resulting from the failure to serve those defendants with process for a two-year period. As stated earlier, however, the time period covered by the destroyed records is uncertain at best. Unless those records covered some period of James' working life at Bessemer, they would have been largely irrelevant to the defenses of the Pride defendants. Nevertheless, because we have remanded on the prejudice issue as it pertains to Chevron and Texaco, it is our view that a remand on the relation-back issue as to the Pride defendants is also necessary.

Upon completion of the "prejudice" hearing, the motion judge should make detailed findings of fact and conclusions of law respecting the Pride defendants' motion to dismiss plaintiff's amended complaint. In the process, the motion judge should be mindful that because different equitable considerations are implicated, the balancing judgments to be made in the "relation back" situation are not necessary congruent with those called for in a "time of service" scenario.

## XI

We reverse the summary judgment in favor of Sunoco, Mobil, CITGO, Amoco, Shell, Exxon, Chevron and Texaco insofar as that

judgment was based on plaintiff's purported failure to make out a *prima facie* case of medical causation. We remand the matter against these defendants for further proceedings. We also vacate the summary judgment in favor of Chevron and Texaco, and the order denying the Pride defendants' motion to dismiss plaintiff's amended complaint. A hearing should be conducted for further development of the facts underlying the prejudice issues raised by Chevron, Texaco and the Pride defendants. Summary judgment in favor of Daicolor, North American and Macarthur is reversed and the matter is remanded for further proceedings, including completion of plaintiff's discovery from those defendants. In all other respects, the orders appealed from are affirmed.

Affirmed in part; reversed in part and remanded for further proceedings.