714 A.2d 898

IDA JAMES, INDIVIDUALLY AND AS ADMINISTRATRIX THE APPELLATE DIVISION PROSEQUENDUM AND GENERAL ADMINISTRATRIX OF THE ESTATE OF WALTER JAMES, PLAINTIFF–RESPONDENT, v. BESSEMER PROCESSING CO., INC., ROMAN HEART, BAKER LITE CO., AMERICAN CYANAMID COMPANY, LINDE GASES OF THE MID–ATLANTIC, INC., MELLEN CHEMICALS, INC., POPE CHEMICAL, NOW KNOWN AS DAICOLOR–POPE, INC. AND JOHN DOES 1–200, DEFENDANTS, AND HOOKER CHEMICAL CO., NOW KNOWN AS OCCIDENTAL CHEMICAL CORP., STANDARD OIL, NOW KNOWN AS EXXON COMPANY, USA, TEXAS OIL, NOW KNOWN AS TEXACO INC., SHELL OIL, NOW KNOWN AS SHELL OIL COMPANY, CHEVRON OIL, NOW KNOWN AS CHEVRON U.S.A., INC., SUN OIL, NOW KNOW AS SUN COMPANY INC., MOBIL OIL, NOW KNOWN AS MOBIL OIL CORPORATION, MACARTHUR PETROLEUM, NOW KNOWN AS MACARTHUR PETROLEUM & SOLVENTS COMPANY, PRIDE SOLVENTS, NOW KNOWN AS PRIDE SOLVENTS & CHEMICAL CO. OF NEW JERSEY, INC., ASHLAND CHEMICAL, NOW KNOWN AS ASHLAND CHEMICAL, INC., AMOCO, NOW KNOWN AS AMOCO CORPORATION, CITGO, NOW KNOWN AS CITGO PETROLEUM CORPORATION, NORTH AMERICAN PAINT MANUFACTURING CO., NOW KNOWN AS NORTH AMERICAN PAINT COMPANY, DEFENDANTS–APPELLANTS.

Argued March 16, 1998—Decided July 27, 1998.

282

*James Crawford Orr* argued the cause for appellants Exxon Company, U.S.A., Occidental Chemical Corp, Shell Oil Company, Mobil Oil Corporation, Sun Company Inc., Ashland Chemical, Inc., Texaco Inc., North American Paint Company (*Wilson, Elser, Moskowitz, Edelman & Dicker*, attorneys; *Susan Karlovich*, on the brief).

*Sally H. Atkins* argued the cause for appellant Chevron U.S.A. Inc. (*Slowinski Atkins,* attorneys; *Matthew S. Slowinski,* of counsel).

*Ronald M. Gutwirth* argued the cause for respondent.

*Mark L. Czyz* on behalf of appellant CITGO Petroleum Corporation relied upon the brief submitted by Exxon Company, U.S.A., Occidental Chemical Corp, Shell Oil Company, Mobil Oil Corporation, Sun Company Inc., Ashland Chemical, Inc., Texaco Inc., North American Paint Company (*Mattson & Madden,* attorneys).

*Richard M. Mandel* submitted a letter in lieu of brief on behalf of appellants Pride Solvents & Chemical Co. of New Jersey, Inc. (*O'Brien, Liotta & Mandel,* attorneys).

*Joel R. Clark* submitted a brief on behalf of appellants MacArthur Petroleum & Solvents Company (*McGivney & Kluger,* attorneys, *Mr. Clark* and *Charles M. McGivney, Jr.,* on the brief).

*David S. Osterman* on behalf of appellant Amoco Corporation relied upon the brief submitted by Exxon Company, U.S.A., Occidental Chemical Corp, Shell Oil Company, Mobil Oil Corporation, Sun Company Inc., Ashland Chemical, Inc., Texaco Inc., North American Paint Company (*McCarter & English,* attorneys).

*Michael D. Loprete* submitted a brief on behalf of amicus curiae Chemical Manufacturers Association (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Loprete, Anthony P. LaRocco* and *Heather L. Akawie,* on the brief).

STEIN, J.,

The critical issue presented by this appeal concerns the specificity of proofs required to entitle plaintiff to a jury trial on the question whether decedent's stomach and liver cancer was proximately caused by prolonged, frequent and repetitive exposure to defendants' petroleum and chemical products that contained no warning of their hazardous propensities. Defendants contend that the lack of proof of the specific content of their individual products

and lack of proof of specific exposure to each product justified the Law Division's grant of summary judgment.

Over the course of his twenty-six years of employment with Bessemer Processing Company, Inc. (Bessemer), decedent Walter James (James) was exposed on a daily basis to a wide array of residues of petroleum products and other chemical substances, many allegedly containing benzene, polycyclic aromatic hydrocarbons and other human carcinogens. On February 8, 1990, at the age of fifty-two, James died of stomach and liver cancer. James's widow, plaintiff Ida James, brought this survivorship and wrongful death action against multiple defendants, alleging that they failed to warn of the dangerous propensities of the substances they shipped to Bessemer and that James's continuous exposure to those substances was the cause of his illness and death.

The Law Division granted summary judgment to all defendants on the ground that plaintiff would be unable to establish that James's cancer was caused by specific products manufactured by specific defendants. That court issued separate orders dismissing plaintiff's complaint against various defendants on procedural grounds. The Appellate Division reversed the summary judgment order dismissing plaintiff's complaint against all named defendants. *James v. Chevron U.S.A., Inc.*, 301 *N.J.Super.* 512, 522–23, 694 *A.2d* 270 (1997). The defendants affected by the summary judgment order reversed by the Appellate Division were the following petroleum manufacturers: Shell Oil Company (Shell), Exxon Company, USA (Exxon), Amoco Corporation (Amoco), CITGO Petroleum Corporation (CITGO), Chevron U.S.A., Inc. (Chevron), Texaco, Inc. (Texaco), Sun Company, Inc. (Sunoco), and Mobil Oil Corporation (Mobil)(collectively "the petroleum defendants"). Also affected were the following manufacturers and suppliers of various other chemical substances: Ashland Chemical, Inc. (Ashland), Occidental Chemical Corporation (Occidental)(successor to named defendant Hooker Chemical Company), Daicolor–Pope, Inc. (Daicolor–Pope), Pride Solvents & Chemical Company of New Jersey, Inc. (Pride), MacArthur Petroleum & Solvent Company (MacArthur), and North American Paint Company

(North American Paint) (collectively "the chemical defendants").[1] Additionally, the Appellate Division reversed the separate orders dismissing plaintiff's complaint on procedural grounds in favor of defendants Texaco and Chevron, remanding for a hearing to determine whether Chevron and Texaco were prejudiced by plaintiff's untimely service of process upon them. *Id.* at 523, 694 *A.*2d 270. The Appellate Division's holding reversing an additional order of the Law Division granting summary judgment on procedural grounds to Daicolor–Pope, MacArthur and North American Paint is not under review by this Court.

The primary issue posed by this appeal is whether a plaintiff in a toxic-tort, failure-to-warn case can establish a *prima facie* case on the element of "medical causation" by satisfying the "frequency, regularity and proximity" test pronounced by the Appellate Division in *Sholtis v. American Cyanamid Co.,* 238 *N.J.Super.* 8, 568 *A.*2d 1196 (1989), absent evidence that the illness was caused by specific products manufactured by specific defendants. Additionally, we must determine whether a showing of prejudice to the moving parties is required to support a trial court's determination to dismiss a plaintiff's complaint without prejudice pursuant to *Rule* 4:4–1.

I

As this appeal arises from the Law Division's order of summary judgment in favor of defendants, we review the evidentiary record

---

[1] Although the Appellate Division opinion did not address the question whether summary judgment was properly granted in favor of Ashland, Occidental and Pride, those defendants remain in this action and joined the petition for certification seeking this Court's reversal of the Appellate Division's decision. Named-defendant Linde Gases was dismissed by stipulation of the parties in July 1995. Named-defendants Roman Heart and Baker Lite Company are not referred to in the record before the Court, and we presume they are no longer parties to this action. Pope Chemical, named separately in the complaint, is in fact a predecessor of Daicolor–Pope, Inc. rather than a separate entity. Daicolor–Pope, Inc. did not join the other defendants that petitioned for certification and thus is not a party to this appeal, although our disposition undoubtedly will affect its posture on remand.

in a light most favorable to plaintiff. *Brill v. Guardian Life Ins. Co.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). James began his employment with Bessemer in September 1963 at the age of twenty-five and worked as a general laborer at Bessemer's Newark facility for twenty-six years until his illness forced his retirement in October 1989. Bessemer, a wholly-owned subsidiary of Kingsland Drum and Barrel (Kingsland), was engaged in the cleaning and reconditioning of used and empty fifty-five-gallon drums for further use by the petroleum industry and certain other chemical manufacturers. Generally, Kingsland would retain those drums that could be cleaned through a hot water and caustic washing process, and would forward to Bessemer those drums that either contained stickier and more viscous residues requiring incineration and blasting, or those drums that needed to be recontoured because of physical damage. In all, Kingsland forwarded to Bessemer approximately thirty percent of the drums it received from its customers. The entities supplying drums to Kingsland for reconditioning had no direct contact with Bessemer, because all drums were originally sent to Kingsland and Kingsland billed the entities who supplied the drums for the reconditioning services performed by Bessemer.

The reconditioning process that took place at Bessemer was multi-staged and, according to Bessemer employees, each stage of the process exposed the workers to noxious fumes and chemicals. The first stage of the process was the emptying of the drums. Although by federal regulation the "empty" drums sent by oil producers were supposed to have no more than one inch of residue, Bessemer employees indicated in depositions that most drums contained as much as four or five gallons of waste material when they arrived at the Bessemer plant. The drums were first brought to the "cutting room" where workers uncapped the heads of the drums. The noxious fumes from the chemicals in the drums pervaded the cutting room, and workers in that room could not avoid inhaling those fumes. After the drums were uncapped, as much residue as could be removed prior to incineration and blasting was dumped into a "slop hole," a pit approximately six-

feet deep that collected beneath a conveyor. During this empty-ing process, waste material from the drums frequently spilled onto the skin and clothing of the workers. Twice a month, workers would empty or clean out the slop hole, partly with the aid of a front-end loader, and partly by removing the residue manually with shovels and buckets. James was frequently involved in cleaning out the slop hole, both as an operator of the front-end loader and manually with a shovel.

Next, the uncapped drums were turned upside down and placed on a drag-chain conveyor that transported them through a "tunnel incinerator" operated by Bessemer workers where the remaining residue in the drums was burned and charred by high tempera-ture flames. The "strong and foul" smell of the burning chemicals permeated the area surrounding the incinerator and those work-ers who operated it inhaled the emanating fumes. The drums were then sand blasted to remove all of the charred material, releasing dust and fumes into the air to which the workers also were exposed. The drums were then washed with nitrate and soda, straightened by a "rolling machine," sealed by a "head up machine" or "heading machine," welded by a welding machine, and tested for holes by a steamer machine. The drums were then rewashed, placed in an oven to dry, and then painted by Bessemer employees. Following the completion of the reconditioning pro-cess, the drums were either resold or returned to the suppliers for reuse.

During his employment with Bessemer, James functioned pre-dominantly as a "utility man," available to fill in for absent workers at any position in the plant as required by his employer. Daniel Stewart, who worked for Bessemer from 1949 until 1984, indicated that he saw defendant perform every job required at the Bessemer plant, including cutting the heads off drums; operating the incinerator, sand blaster, rolling machines, and heading ma-chines; welding and painting drums; and, as previously described, cleaning the slop hole. James was diagnosed with stomach cancer in October 1989. He died at the age of fifty-two on February 8,

1990. The cause of his death was "carcinoma with metastasis to the liver and peritoneum."

Due to a lack of business, Kingsland and Bessemer ceased operations in June 1992. The business records that had been kept at Bessemer throughout the period of James's employment were "production documents" that indicated the number of drums that had been reconditioned. However, they did not indicate the name of the corporate customer that had provided to Kingsland the drums that were reconditioned at Bessemer, nor did they indicate the specific chemical residue contained in any particular drum. All other records were kept at Kingsland, including bills of lading and billing invoices indicating the number of drums picked up by Kingsland drivers from a specific customer, but not reflecting the content of the empty drums. Pursuant to the requirements of the Resource Conservation Recovery Act (RCRA), 42 *U.S.C.A.* § 6901, *et seq.*, each shipment of drums picked up by Kingsland contained a certification from the supplier of the drums attesting that the supplier used its best efforts to remove the residue in the drums. However, the RCRA certifications did not indicate the nature of the residue in the drums.

Beginning some time in the late 1980s, around the time that James was diagnosed with cancer, Kingsland began receiving Material Safety Data Sheets (MSDSs) from both the companies supplying drums for reconditioning and the companies supplying various products used in the reconditioning process. The MSDSs contained warnings of and safety instructions regarding the hazards of the residues and products received. However, although such MSDSs were provided for each substance that Kingsland potentially might receive, they did not necessarily indicate which specific products or residues a supplier had provided to Kingsland or in what quantities drums containing such residues may have been supplied. Kingsland officials indicated that all records generally were kept for three years and then destroyed. At some time within a few months after the cessation of operations at Kingsland and Bessemer in June 1992, Kingsland representatives

destroyed all of the existing records that may have been pertinent to this litigation. Those defendant suppliers and manufacturers that responded to plaintiff's interrogatories all indicated that they knew of no records kept by their companies indicating the quantities, trade names or chemical compositions of any of the residues contained in drums sent to Bessemer by Kingsland for reconditioning.

Many of the drums that arrived at Bessemer had labels that listed the contents of the drum, displayed the name of the manufacturer of the contents, and contained some general health warnings that became more specific around the late 1980s. Those labels were removed as part of the incineration process. In November 1989, Kingsland received a citation from the Occupational Safety and Health Administration (OSHA) for failure to have a hazardous communication plan describing to its workers the hazards of residues contained in the drums with which they worked daily.

Because of the lack of documentation concerning the identity of the suppliers of the drums that were reconditioned at Bessemer and the identity of the material in those drums, plaintiff was required to rely predominantly on the memory of Bessemer employees and executives in her efforts to obtain discovery regarding that information. Before joining Bessemer as a defendant in this action, plaintiff served interrogatories on Bessemer, one of which asked for the identity of the chemical compositions and trade names of all of the substances to which James was exposed during his employment with Bessemer. Bessemer answered by explaining that James

was subject to exposure from any type of material that might be shipped in 55 gallon steel drums, except herbicides, pesticides and hazardous materials described in 49 C.F.R. § 261.33(e)(acutely hazardous materials). Empty drums whose previous contents held the aforementioned material were not accepted at Bessemer. The majority of the empty drums, from 1960 to the mid eighties would have contained petroleum based products. From the early eighties to 1989, the mixture of the drum residues became highly varied, and included but [was] not limited to: resins, dyes, paints, solvents, fragrances and unknown substances.

Plaintiff deposed Glenn Richard, the environmental and regulatory affairs officer for both Kingsland and Bessemer between 1984 and 1992, who identified Shell, Exxon, Chevron, Texaco, Sunoco, CITGO, Gulf and Mobil as entities that historically had provided drums to Kingsland. He testified that those drums generally contained residues from finished oil products or from raw material constituents of finished products. Richard further indicated that although Kingsland never dealt directly with Amoco, the Kingsland and Bessemer plants may have received for reconditioning drums containing residues of Amoco products. Richard identified Ashland Chemical, American Cyanamid Company, MacArthur Petroleum and Mellen Chemicals (acquired in 1990 by defendant Pride Solvents & Chemical Company) as entities that supplied drums containing chemicals and solvents. He indicated that Pope Chemical sent drums containing residues of blue and yellow dyes, and that North American Paint, Pan Chemical, Whittaker Chemical and Rising Star Coating provided the paints and liners used in the reconditioning process. Richard indicated that during peak years as many as 150,000 drums per year were sent to Bessemer for reconditioning, with 1,200 drums being reconditioned on a "good day."

Irving Klein, president and half-owner of Bessemer, who began working for Kingsland as a salesman in 1954, indicated that Texaco, Exxon and Shell were Kingsland's three biggest customers, with CITGO, Mobil and Sunoco not far behind. Klein testified that Texaco, Exxon, Shell and CITGO were customers for approximately forty years, American Cyanamid Company for thirty-five years, and Pope Chemical for over twenty years. Chevron and Baker Lite Company had been customers for approximately twenty-five years. Ashland Chemical and Prime Lube, an entity that filled orders for Amoco and Arco, had been customers for six years, MacArthur Petroleum & Solvent and Mellen Chemicals for four years, and Mobil for two years. Klein also recalled buying paint from North American Paint and Rising Star Coating, as well as selling reconditioned drums to North American Paint. Klein

did not identify Occidental or Linde Gases as customers or suppliers.

Plaintiff deposed or received statements from five former Bessemer employees, each of whom had some recollection of the nature of the substances to which the employees were regularly exposed, as well as the manufacturers and/or suppliers of those substances. Daniel Stewart regularly observed drums from Shell, Exxon, Chevron and Texaco that generally contained gasoline and motor oil, and recalled that other entities that regularly supplied drums included American Cyanamid, Hooker Chemical, Roman Heart and Baker Lite. Stewart's certification stated that virtually all of the 55–gallon drums received by Bessemer had product residue left inside, usually amounting to four or five gallons of residue material, and that all drums emitted strong odors. The odor from some drums was so foul that they had to be stored outside for two to three days before they could be processed.

Roosevelt Lewis, a Bessemer employee from 1963 until 1992, testified at deposition that he saw drums from Shell, Texaco, Chevron, Exxon, Sunoco, Amoco, Mobil, CITGO, American Cyanamid and Pope Chemical "every day" at the Bessemer plant. He recalled that the drums from the petroleum defendants contained residues including light and dark oils, gasoline, and antifreeze. He recognized the gasoline and oil residues by sight and smell, describing the oil residues as "burned, black and sticky," and noting that the fumes from the drums sent by Exxon, Shell, Texaco and CITGO were "pretty strong," and that drums from those manufacturers at times contained "quite a bit of residue." He indicated that the drums from Pope contained blue, black and green dyes. On cross-examination, Lewis indicated that not all of the drums had labels, but that he identified some regular suppliers based on overhearing the dispatcher who sent trucks to the suppliers for pickups.

Eddie Kennedy, who worked at Bessemer for the entire period of its operations, recalled seeing on a regular basis drums from Chevron, CITGO, Mobil, Texaco, Exxon, Sunoco, Shell, Amoco and

Gulf that contained "oil residue which was light to dark black in color." He described "frequently" seeing Texaco drums containing oils, black oils and gasoline.

Thomas Mewborn, a maintenance man and shop steward at Bessemer from 1977 until 1992, often unloaded drums arriving at the plant that contained gasoline, crude oil, diesel fuel, hydraulic oil and antifreeze. Although he could not specifically recall which entities supplied drums containing which residues, Mewborn regularly observed drums from Exxon, Shell, Texaco and CITGO. Johnny Ramey, a Bessemer employee from 1976 until 1990, recalled seeing drums from Exxon, Shell, Texaco, Chevron, Gulf, and CITGO. He testified specifically that the Exxon drums contained gas and oil, and he described using oil residue from some of the drums to operate his personal car.

James Davis, James's brother-in-law, worked as a drum inspector at Kingsland from 1965 until 1990. He recalled that the drums forwarded to Bessemer included drums from Texaco, Shell, Exxon, Mobil, Chevron and Sunoco. Those drums contained such substances as heavy industrial oil, machine oil, transmission oil, motor oil and antifreeze. Davis also traveled approximately once a week to the Bessemer plant, where he recalls having seen drums from those oil companies, as well as from American Cyanamid and Hooker Chemical. Davis recalled drums from Hooker Chemical that emitted such a strong and foul odor that employees needed to wear masks in order to handle the drums.

Additionally, Lewis, Kennedy, Mewborn and Davis each recalled seeing drums containing formaldehyde residue, but could not identify the entity or entities that supplied those drums. Mewborn indicated that the fumes from the formaldehyde drums were particularly strong, and that employees handling those drums would wear charcoal filter masks. Lewis, Kennedy and Stewart each observed drums containing embalming fluid, but could not identify the entity or entities from which those drums came.

In addition to the information elicited during discovery from lay witnesses, the record before the Law Division on defendants'

motion for summary judgment included the reports of plaintiff's toxicological, medical and economic experts. Plaintiff's expert in toxicology, Dr. Myron Mehlman, reviewed summaries of James's medical records, summaries of deposition transcripts and witness statements, as well as scientific, governmental and medical literature on the carcinogenicity of various chemicals to which James was exposed during his employment at Bessemer. Dr. Mehlman cites several studies dating back as far as 1928 indicating the health risks of benzene exposure and describes decades-old epidemiological studies revealing a causative link between cancer and exposure to benzene and polycyclic aromatic hydrocarbons (PAHs) found in gasoline and petroleum products.

The toxicologist's report explains that "[b]enzene is present in many petroleum products, petroleum distillates, jet fuels, diesel fuels, crude oil, and is a significant component of gasoline (up to 6%)," and that "[b]enzene is currently classified by the Environmental Protection Agency (EPA), the American Conference of Governmental Industrial Hygenists (ACGIH), and IARC [the International Agency for Research on Cancers] as a human carcinogen." The report adds that "[a]nimal studies ... have clearly and without question demonstrated the carcinogenic effects of benzene...."

Dr. Mehlman indicated that "PAHs are a group of chemicals that are present in oil, petroleum products, and tobacco smoke. There are more than 100 different PAH compounds. Usually humans are not exposed to an individual PAH alone, but to a mixture of PAHs." The report indicates PAHs can enter the body through inhalation or skin contact, and that the primary exposure to PAHs occurs in the workplace. Many of the PAHs have been found to cause cancer in animals, and "[r]eports on humans show that individuals exposed to PAHs by inhalation or skin contact for long periods [or] to mixtures that contain PAHs and other compounds can also develop cancer." The Department of Health and Human Services has determined that six PAH compounds are carcinogens. IARC classifies thirteen PAH compounds as "having

sufficient evidence for carcinogenicity (meaning they are human carcinogens)." The EPA has also determined that those thirteen PAH compounds are "probable human carcinogens," meaning that they more likely than not cause cancer.

Based on the testimony of Bessemer workers and the MSDSs provided in discovery by Shell and Exxon, Dr. Mehlman determined that the chemicals and products to which James was exposed included black oils, motor oils, PAHs, solvents and formaldehydes. He noted that many of the MSDSs provided by Exxon "indicate that numerous products contained extremely high levels of benzene and PAHs." Based on the evidence obtained by plaintiff during discovery and on numerous epidemiological and animal studies, Dr. Mehlman concluded that

> workplace exposures to various petroleum products (i.e., benzene, gasoline, mineral spirits, mineral oils) and chemicals, which contain gasoline, aromatic hydrocarbons, such as benzene, toluene, xylene, ethyl benzene, naphtha, acrylonitrile, formaldehyde, polycyclic aromatic hydrocarbons (i.e., benzo-alpha-pyrene), light cat-cracked naphtha ("LCCN") and other chemicals caused Mr. James to suffer from stomach and liver cancer.

Plaintiff also presented two reports of her medical expert, Dr. Rowland Goodman. Relying on the evidence obtained during discovery and on the report of the toxicological expert, Dr. Goodman concluded that

> the patient absorbed one or more of these carcinogens through his gastrointestinal tract and through his lungs. These chemicals then spread to his stomach causing a derangement of the DNA mechanism such that one or more of the cells grew in an uncontrolled fashion clinically known as cancer.

Finally, plaintiff offered the report of an economic expert, Dr. Frank Tinari, who estimated "the total present value of the projected losses resulting from the death of Walter James" at $1,243,830. That amount included estimated values for loss of income, loss of household services, and loss of companionship to plaintiff.

## II

As an "environmental tort action," defined by statute as a "civil action seeking damages for harm where the cause of the

harm is exposure to toxic chemicals or substances," this action is excluded from coverage under the 1987 Product Liability Act, *N.J.S.A.* 2A:58C–1b(4). In cases to which the act does not apply, plaintiffs may resort to common law causes of action. *Becker v. Baron Bros.*, 138 *N.J.* 145, 151, 649 *A.*2d 613 (1994). A products-liability action at common law may rest on grounds of negligence, strict liability, or both. See *Freund v. Cellofilm Properties, Inc.*, 87 *N.J.* 229, 237, 432 *A.*2d 925 (1981). This Court in *Freund* noted the most important distinction between those two bases of products liability:

> [U]nder strict liability, the seller's knowledge is presumed; it is "assume[d] the seller knew of the product's propensity to injure as it did." In negligence cases, such knowledge must be proved; the standard is what the manufacturer "knew or should have known."
>
> [*Id.* at 239, 432 *A.*2d 925 (quoting *Phillips v. Kimwood Machine Co.*, 269 *Or.* 485, 525 *P.*2d 1033, 1039 (1974)).]

Here, plaintiff alleges that defendants failed to warn James of the dangerous propensities of their products, the residues contained in the drums sent for reconditioning, and the products sold for use in the reconditioning process, and that those products were the cause of James's cancer and of his death from that illness. She asserts both strict-liability and negligence claims.

### A

This Court set forth the elements of a cause of action for strict liability in the context of a products-liability, failure-to-warn claim in *Coffman v. Keene Corp.*, 133 *N.J.* 581, 593–95, 628 *A.*2d 710 (1993). We explained that

> [t]o establish a cause of action in strict liability for a defective product, a plaintiff must prove that the defect existed when the product left the defendant's control and that the defect caused injury to a reasonably foreseeable user. In a failure-to-warn case, the alleged product defect is not a flaw in the structure or design of the product itself. Rather, the defect is the absence of a warning to unsuspecting users that the product can potentially cause injury. Nevertheless, the same elements to establish a cause of action apply when a plaintiff's claim concerning a defective product is based on a failure to warn.
>
> [*Id.* at 593–94, 628 *A.*2d 710 (citations omitted).]

Just as in this case, the failure-to-warn claim in *Coffman* arose from an occupational exposure over many years to the products of multiple manufacturers, in that case asbestos products, that led to the plaintiff's illness. *Id.* at 590–92, 628 *A*.2d 710. As in most toxic or environmental tort actions, the predominant issue was whether the plaintiff could satisfy the element of causation. The Court stated that

[c]ausation is a fundamental requisite for establishing any product-liability action. The plaintiff must demonstrate so-called product-defect causation—that the defect in the product was a proximate cause of the injury. When the alleged defect is the failure to provide warnings, a plaintiff is required to prove that the absence of a warning was a proximate cause of his harm.

[*Id.* at 594, 628 *A*.2d 710.]

However, we also adopted in *Coffman* a rebuttable "heeding presumption" in products—liability, failure-to-warn cases. We held that

with respect to the issue of product-defect causation in a product-liability case based on a failure to warn, the plaintiff should be afforded the use of the presumption that he or she would have followed an adequate warning had one been provided, and that the defendant in order to rebut that presumption must produce evidence that such a warning would not have been heeded.

[*Id.* at 603, 628 *A*.2d 710.]

We stressed that the effect of the heeding presumption would be to "direct factual inquiries to the real causes of injury in a failure-to-warn case." *Id.* at 601, 628 *A*.2d 710. In other words, it would shift the plaintiff's burden on the element of causation away from proof that the defendant's failure to warn caused the plaintiff's exposure to the defendant's product (product-defect causation), and toward proof that the defendant's product caused the plaintiff's injury or illness (medical causation), *infra* at 297–302, 714 *A*.2d at 907–910.

As a result of the heeding presumption, the burden on a plaintiff to establish product-defect causation in the failure-to-warn context is not an onerous one. Initially, the plaintiff must establish that the defendant had a duty to warn. To establish such a duty, the plaintiff must satisfy "a very low threshold of proof in order to impute to a manufacturer sufficient knowledge to

trigger the duty to provide a warning of the harmful effects of its product." *Id.* at 599, 628 *A.*2d 710. In cases proceeding under a theory of strict liability, knowledge of the harmful effects of a product will be imputed to a manufacturer on a showing that "knowledge of the defect existed within the relevant industry." *Ibid.* Once proof of such knowledge in the industry has been established, triggering the duty to warn, the plaintiff must show that an adequate warning was not provided. When proceeding under a theory of negligence, the plaintiff must demonstrate that the specific defendant knew or should have known of the potential hazards of the product. *Freund, supra,* 87 *N.J.* at 239, 432 *A.*2d 925. Then, assuming that the heeding presumption is unrebutted, it may be presumed that the defendant's failure to warn caused the plaintiff's harmful exposure to the product. Thus, "product-defect causation" in the failure-to-warn context is presumed upon proof that the defendant had a duty to warn and does not require proof of actual causation to satisfy the plaintiff's burden on that element. A plaintiff must introduce evidence that the defendant's failure to warn of the hazards of its product led to plaintiff's exposure only if it becomes necessary to defeat a defendant's attempt to rebut the heeding presumption with its own proofs.

As noted by the court below, the fact that Bessemer may have failed its employees by not warning or instructing them regarding the hazards of toxic exposure in the workplace does not necessarily relieve defendants from liability for failure to warn. *James, supra,* 301 *N.J.Super.* at 539–41, 694 *A.*2d 270. In the employment context, a manufacturer's duty to warn of the dangers posed by its products extends to both the employer and the employees of the recipient entity. *Coffman, supra,* 133 *N.J.* at 606–09, 628 *A.*2d 710. The heeding presumption also applies to both the employer and the employee. *Id.* at 607, 628 *A.*2d 710. Again, that heeding presumption is rebuttable with respect to either the employer or the employee. We held in *Coffman* that

to overcome the heeding presumption in a failure-to-warn case involving a product used in the workplace, the manufacturer must prove that had an adequate warning been provided, the plaintiff-employee with meaningful choice would not have

heeded the warning. Alternatively, to overcome the heeding presumption, the manufacturer must show that had an adequate warning been provided, the employer itself would not have heeded the warning by taking reasonable precautions for the safety of its employees to take measures to avoid or minimize the harm from their use or exposure to the dangerous product.

· [*Id.* at 609, 628 *A.*2d 710.]

Whether either James or his superiors at Bessemer would have heeded warnings from defendant manufacturers had adequate warnings been provided over the course of James's employment and exposure is a question for the jury, and the burden of proof on that issue lies with defendants.

### B

In a toxic-tort action, in addition to product-defect causation a plaintiff must prove what is known as "medical causation"—that the plaintiff's injuries were proximately caused by exposure to the defendant's product. See *Becker, supra,* 138 *N.J.* at 152, 649 *A.*2d 613; *Coffman, supra,* 133 *N.J.* at 594, 628 *A.*2d 710; *Sholtis, supra,* 238 *N.J.Super.* at 30–31, 568 *A.*2d 1196. As recognized by the Appellate Division below, 301 *N.J.Super.* at 528 n. 3, 694 *A.*2d 270, the requirement set forth in *Coffman* that a plaintiff prove both product-defect and medical causation applies not only to asbestos cases, but also to other cases involving occupational exposure to toxic materials. See William A. Dreier *et al., New Jersey Products Liability & Toxic Torts Law* § 33:3, at 568 (1996). To prove medical causation, a plaintiff must show "that the exposure [to each defendant's product] was a substantial factor in causing or exacerbating the disease." *Sholtis, supra,* 238 *N.J.Super.* at 30–31, 568 *A.*2d 1196.

This Court has emphasized for over a decade the "extraordinary and unique burdens facing plaintiffs who seek to prove causation in toxic-tort litigation." *Rubanick v. Witco Chem. Corp.,* 125 *N.J.* 421, 433, 593 *A.*2d 733 (1991); *see also Landrigan v. Celotex Corp.,* 127 *N.J.* 404, 413, 605 *A.*2d 1079 (1992)(noting that in toxic-tort context "proof that a defendant's conduct caused decedent's injuries is more subtle and sophisticated than proof in cases concerned with more traditional torts"); *Ayers v. Jackson Township,* 106

*N.J.* 557, 585–87, 525 *A.*2d 287 (1987). In *Ayers,* we elaborated on the unique difficulties facing toxic-tort plaintiffs:

> By far the most difficult problem for plaintiffs to overcome in toxic tort litigation is the burden of proving causation. In the typical tort case, the plaintiff must prove tortious conduct, injury and proximate cause. Ordinarily, proof of causation requires the establishment of a sufficient nexus between the defendant's conduct and the plaintiff's injury. In toxic tort cases, the task of proving causation is invariably made more complex because of the long latency period of illnesses caused by carcinogens or other toxic chemicals. The fact that ten or twenty years or more may intervene between the exposure and the manifestation of disease highlights the practical difficulties encountered in the effort to prove causation.
>
> [*Id.* at 585, 525 *A.*2d 287.]

Legal scholars have long struggled with the problem of adapting traditional legal doctrines of causation to the difficulties of proving medical causation in the toxic-tort context, but courts have been resistant to novel models of causation. *See, e.g.,* Margaret A. Berger, *Eliminating General Causation: Notes Towards a New Theory of Justice and Toxic Torts,* 97 *Colum. L.Rev.* 2117 (1997); David M. Benjamin, *Elements of Causation in Toxic Tort Litigation: Science and Law Must Agree,* 14 *J. Legal Med.* 153 (1993); Susan R. Poulter, *Science and Toxic Torts: Is There a Rational Solution to the Problem of Causation?,* 7 *High Tech. L.J.* 189 (1992); Christopher L. Callahan, *Establishment of Causation in Toxic Tort Litigation,* 23 *Ariz. St. L.J.* 605 (1991); Paul K. Sidorenko, *Evidentiary Dilemmas in Establishing Causation: Are Courts Capable of Adjudicating Toxic Torts?,* 7 *Cooley L.Rev.* 441 (1990); L. Grant Foster, *A Case Study in Toxic Tort Causation: Scientific and Legal Standards Work Against Recovery for Victims,* 19 *Envtl. L.* 141 (1988); Ora Fred Harris, Jr., *Toxic Tort Litigation and the Causation Element: Is There Any Hope of Reconciliation?,* 40 *Sw. L.J.* 909 (1986). In our toxic-tort precedents, this Court has tried to strike a balance with regard to proof of causation that is fair to both plaintiffs and defendants in view of the almost certain lack of direct scientific proof in such cases.

The problem of proving medical causation with respect to a specific defendant's products is further compounded where, as

here, a plaintiff has been exposed to multiple products of multiple defendants over an extended period of time. *See, e.g., Sholtis, supra,* 238 *N.J.Super.* at 14–16, 568 *A.*2d 1196 (reviewing facts evincing plaintiffs' occupational exposure over more than four decades to asbestos products of multiple defendants). In such a case, the burden of proving that the plaintiff's exposure to the products of any single defendant was a "substantial factor" causing or exacerbating the plaintiff's illness is a formidable one. The Appellate Division panel in *Sholtis* relied on a Fifth Circuit decision that had addressed a similar issue in determining causation in a multiple-defendant, asbestos-exposure context. *Id.* at 26–27, 568 *A.*2d 1196. In *Borel v. Fibreboard Paper Products Corp.,* 493 *F.*2d 1076, 1094 (5th Cir.1973), *cert. denied,* 419 *U.S.* 869, 95 *S.Ct.* 127, 42 *L. Ed.*2d 107 (1974), the court stated:

In the instant case, it is impossible, as a practical matter, to determine with absolute certainty which particular exposure to asbestos dust resulted in injury to Borel. It is undisputed, however, that Borel contracted asbestosis from inhaling asbestos dust and that he was exposed to the products of all the defendants on many occasions. It was also established that the effect of asbestos dust is cumulative, that is, each exposure may result in an additional and separate injury. We think, therefore, that on the basis of strong circumstantial evidence the jury could find that each defendant was the cause in fact of some injury to Borel.

Consistent with the reasoning of the court in *Borel,* and borrowing language from the Fourth Circuit's opinion in *Lohrmann v. Pittsburgh Corning Corp.,* 782 *F.*2d 1156, 1162–63 (4th Cir.1986), the court in *Sholtis, supra,* 238 *N.J.Super.* at 28–29, 568 *A.*2d 1196, adopted a "frequency, regularity and proximity" test to establish liability in the multiple-defendant, asbestos-exposure context. Under that test, in order to prove that exposure to a specific defendant's product was a substantial factor in causing or exacerbating the plaintiff's disease, the plaintiff is required to prove "an exposure of sufficient frequency, with a regularity of contact, and with the product in close proximity" to the plaintiff. *Id.* at 28, 568 *A.*2d 1196. The court reemphasized that its adoption of such a standard was required by the unique difficulties faced by a plaintiff attempting to establish causation in the toxic-tort context: "Since proof of direct contact is almost always lacking ... courts must rely upon circumstantial proof of sufficiently intense expo-

sure to warrant liability." *Id.* at 29, 568 *A*.2d 1196 (footnote omitted).

In the context of occupational asbestos-exposure cases, the "frequency, regularity and proximity test" first pronounced in *Lohrmann, supra,* 782 *F*.2d at 1162–63, has often been applied in other jurisdictions. *See, e.g., Shetterly v. Raymark Indus., Inc.,* 117 *F*.3d 776, 780 (4th Cir.1997)(applying Maryland law); *Jackson v. Anchor Packing Co.,* 994 *F*.2d 1295, 1301 (8th Cir.1993)(applying Arkansas law and noting that "a majority of courts have adopted the 'frequency, regularity and proximity' standard"); *Tragarz v. Keene Corp.,* 980 *F*.2d 411, 420 (7th Cir.1992)(indicating that Illinois has adopted frequency, regularity and proximity test, but noting "it is not a rigid test with an absolute threshold level necessary to support a jury verdict"); *Slaughter v. Southern Talc Co.,* 949 *F*.2d 167, 171 & n. 3 (5th Cir.1991)(adopting frequency-regularity-proximity test for causation in asbestos cases and noting that "[c]ourts in every circuit but the D.C. Circuit, and the First, Second and Fifth Circuits have adopted the Lohrmann test. In addition, Michigan, Massachusetts, New Jersey, Illinois, Pennsylvania, Maryland, Nebraska, and Oklahoma have adopted the test."); *Robertson v. Allied Signal, Inc.,* 914 *F*.2d 360, 380 (3d Cir.1990)(applying Pennsylvania law and noting that frequency, regularity and proximity analysis applies to expert scientific testimony as well as to co-worker testimony of exposure). *Cf. Ingram v. ACandS, Inc.,* 977 *F*.2d 1332, 1343–44 (9th Cir.1992)(rejecting frequency, regularity and proximity test where Oregon law applied because causation burden under Oregon law is less stringent, requiring only evidence that defendant's asbestos was present in workplace to create jury question).

We stress that the "frequency, regularity and proximity" test bears no relationship to theories of collective liability that some courts have adopted in contexts where the specific tortfeasor or tortfeasors that caused the plaintiff's injury cannot be identified. The "frequency, regularity and proximity" test assigns liability only to those defendants to whose products the plaintiff can

demonstrate he or she was intensely exposed. The court in *Sholtis* invoked the apt analogy of a multi-vehicle accident:

> What we have before us are not products of unknown manufacturers whose responsibility must be reconstructed by reference to industry market percentages, but rather known manufacturers' products whose contact with plaintiff must be proven or reasonably approximated by inference.... This situation bears some resemblance to a plaintiff being injured in a multi-vehicle accident caused by several culpable parties, whose conduct and defective products all contributed to the eventual injuries.
>
> [*Sholtis, supra,* 238 *N.J.Super.* at 25, 568 *A.2d* 1196.]

The court below rejected defendants' contention that the "frequency, regularity and proximity" test pronounced in *Sholtis* should be limited to cases involving asbestos exposure, holding that

> at least for summary judgment purposes, we are convinced that the *Sholtis* analysis is relevant to the "medical causation" issue in a toxic-tort case, such as this, involving occupational exposure to cancer-causing substances manufactured by a determinant number of defendants, all of whom, it is alleged, acted tortiously by failing to warn of the dangerous propensities of their products.
>
> We recognize that the dynamics and causative effects of exposure to asbestos dust may differ from the disease process resulting from exposure to chemicals containing known carcinogens. However, these differences should not cause rejection of the "frequency, regularity and proximity" model. Based on circumstantial evidence, the jury may find in any toxic-tort case, that a plaintiff in the workplace was exposed to the cancer-causing products of defendant-manufacturers on many occasions, and that the exposures were a substantial factor in causing plaintiff's cancer. Application of the "frequency, regularity and proximity" test necessarily focuses on the cumulative effects of exposure to the carcinogen over a prolonged period of time, the dosage of exposure and mode of absorption into the human body. Bernard D. Goldstein and Mary Sue Henifin, *Reference Manual on Sci. Evid.* 181 (Federal Judicial Center 1994).... Whether the claim is asbestosis or stomach cancer, the frequency, regularity and proximity of exposure will be an important and fundamental factual link in plaintiff's experts' analysis and methodology in reaching an ultimate theory of causation.
>
> [*James, supra,* 301 *N.J.Super.* at 529–30, 694 *A.2d* 270.]

The court further noted a Pennsylvania appellate court decision in which a "frequency and regularity" of exposure standard was applied to the determination of the sufficiency of a complaint seeking damages for workplace exposure to carcinogens (cadmium). *Id.* at 530 n. 4, 694 *A.2d* 270 (citing *Jobe v. W.P. Metz Refining,* 445 *Pa.Super.* 76, 664 *A.2d* 1015, 1020 (1995), *appeal denied,* 544 *Pa.* 659, 676 *A.2d* 1199 (1996)).

■ We agree with the reasoning and conclusion of the Appellate Division, and hold that a plaintiff in an occupational-exposure, toxic-tort case may demonstrate medical causation by establishing: (1) factual proof of the plaintiff's frequent, regular and proximate exposure to a defendant's products; and (2) medical and/or scientific proof of a nexus between the exposure and the plaintiff's condition.

### III

### A

■ That plaintiff has provided *prima facie* proof of "product-defect causation" is quite clear, and is not a significant focus of defendants' claims on appeal. Defendants have not rebutted the heeding presumption. Although they eventually may be able to convince a jury, in view of Bessemer's history of apparent disregard for the health of its workers throughout the period of James's employment, that even an explicit warning of the health risks posed by regular exposure to defendants' products would not have been heeded, that fact has not been established. Therefore, to proceed with her strict-liability claim, plaintiff is required to demonstrate only that knowledge of the potential hazards of exposure to defendants' products existed within the petroleum and chemical industries at the relevant times. Plaintiff's expert in toxicology cited numerous scientific studies, several predating the start of James's employment at Bessemer in 1963, indicating the serious health threat posed by exposure to benzene. A 1948 report from the American Petroleum Institute indicated that "it is generally considered that the only absolutely safe concentration for benzene is *zero.*" The toxicologist's report further referenced studies dating back to the 1950s demonstrating the carcinogenicity of PAHs. In conjunction with plaintiff's evidence demonstrating that sufficient warnings were not provided regarding the health risk posed by the residues in the empty drums supplied to Bessemer, the scientific studies referred to in the toxicologist's report clearly are sufficient to survive summary judgment on the

element of product-defect causation. The evidence is also sufficient to present a fact question for the jury regarding whether each individual defendant knew or should have known of the potential hazards of its products. Thus, plaintiff's negligence claim also survives summary judgment on the element of product-defect causation.

## B

We next turn to the question whether plaintiff has established evidence on medical causation sufficient to withstand defendants' motion for summary judgment. We held in *Brill, supra,* 142 *N.J.* at 523, 666 *A.*2d 146, that

when deciding a motion for summary judgment under *Rule* 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged dispute in favor of the non-moving party.

The deposition testimony and sworn statements of James's co-employees, *supra* at 286–287, 292–293, 714 *A.*2d at 902, 904–905, in combination with the deposition testimony of the Bessemer and Kingsland executives, *supra* at 291–292, 714 *A.*2d at 904, provided substantial evidence that James was frequently, regularly and proximately exposed to petroleum-based products of each of the petroleum defendants. James's duties exposed him every workday to fumes from the residues in the drums reconditioned at the Bessemer plant. Specifically, his work cleaning the slop hole often would have resulted in residue making direct contact with his skin and clothing. Each of the petroleum defendants was specifically identified by multiple fact witnesses as regularly having provided drums containing residues of petroleum-based gasoline or oil products. Shell, Exxon and Texaco were identified as suppliers by every lay witness affiliated with Kingsland and Bessemer. CITGO was identified as a supplier by every witness except Daniel Stewart; Mobil and Sunoco by every wit-

ness except Stewart, Thomas Mewborn and Johnny Ramey; and Chevron by every witness except Mewborn. Glenn Richard and Irving Klein indicated that drums containing residues of Amoco products were supplied to Kingsland and Bessemer by intermediaries, and Amoco products were also identified by Roosevelt Lewis, Eddie Kennedy and James Davis. The Bessemer workers also described the nature of the residues contained in those drums as specifically as they were able. Daniel Stewart described the residues as gasoline and motor oil; Roosevelt Lewis as light and dark oils, gasoline and antifreeze; Eddie Kennedy as oils, black oils and gasoline; Thomas Mewborn as gasoline, crude oil, diesel fuel, hydraulic oil and antifreeze; Johnny Ramey as gas and oil; and James Davis as heavy industrial oil, machine oil, transmission oil and antifreeze. James's co-workers also testified regarding the frequency and intensity of the workers' exposure to those products, either through inhalation of fumes or by direct contact with the skin and clothing.

The reports of plaintiff's experts, *supra* at 294–295, 714 *A.*2d at 905–906, provided medical and scientific evidence that James's cumulative exposure to benzene and PAHs present in those petroleum-based products caused James's stomach and liver cancer.[2] Plaintiff's expert in toxicology was able "to identify many of the chemicals and products to which Mr. James was exposed through the testimony of his co-workers and through several of the Material Safety Data Sheet ("MSDS") [exhibits] provided by Shell Oil and Exxon." From those sources, Dr. Mehlman identified black oils, motor oils and PAH compounds as chemicals and products to which James had been exposed. Dr. Mehlman's report cited numerous scientific studies and reports linking benzene and PAHs contained in petroleum-based products to cancer in animals and

---

[2] We assume, for purposes of this appeal from summary judgment, that the opinions of plaintiff's scientific and medical experts will be deemed admissible in a pre-trial hearing pursuant to *N.J.R.E.* 104. For a discussion of the bases for admission of scientific and medical evidence in toxic-tort actions, see *Landrigan, supra,* 127 *N.J.* 404, 605 *A.*2d 1079; *Rubanick, supra,* 125 *N.J.* 421, 593 *A.*2d 733; and *James, supra,* 301 *N.J.Super.* at 535–36, 694 *A.*2d 270.

humans. Dr. Mehlman and Dr. Goodman both reviewed James's medical records and concluded that the manifestation and progress of his illness was consistent with exposure to those carcinogens, and thus provided *prima facie* evidence of the required link to support plaintiff's theory of causation.

That plaintiff was unable, and likely will be unable at trial, to precisely identify by either product name or chemical composition the exact petroleum products to which James was exposed is an insufficient basis for the Law Division's order granting summary judgment in favor of the petroleum defendants. Representatives of those petroleum defendants that plaintiff had the opportunity to depose indicated that they kept no records of the precise residues contained in the drums that were provided to Kingsland for reconditioning. Even the MSDSs provided by defendants that, crediting plaintiff's proofs, were supplied only toward the very end of James's employment with Bessemer, did not indicate how many drums containing residues of any particular product were provided to Bessemer. Those recordkeeping failures cannot be viewed as defeating plaintiff's failure-to-warn claim; they are more reasonably viewed as indicative of an unfortunate lack of care and responsibility on the part of those defendants with regard to the hazards posed by intense exposure to petroleum products containing benzene and PAHs. Although the lack of adequate records identifying the specific chemical properties of the specific products of each of the petroleum defendants severely hampered plaintiff's ability to satisfy the "frequency, regularity and proximity" standard, it did not preclude plaintiff's reliance on the recollection of lay witnesses to meet that standard.

We hold that plaintiff's proofs provided sufficient product identification with regard to the petroleum defendants to survive summary judgment. Plaintiff's toxicologist could rely on the physical descriptions of James's co-workers to support his expert opinion that the fumes and residues described were of petroleum-based products containing sufficiently high levels of benzene and PAHs

to cause James's cancer. Jurors could rely both on that expert opinion and on the factual testimony of the lay witnesses to determine whether plaintiff proved exposure to such petroleum-based products. A rational factfinder also could conclude from the co-workers' testimony that James was frequently, regularly and proximately exposed to products of each of the petroleum defendants containing those known carcinogens, and thus could conclude that James's exposure to the petroleum products of each defendant was a substantial factor in causing or exacerbating his disease.

The petroleum defendants assert that allowing plaintiff to proceed to trial by identification only of exposure to "petroleum-based products" is unfair, because it places them in the position of having to defend each one of the many different petroleum-based products they manufacture, each one containing different levels of benzene and/or PAHs and thus posing varying degrees of health risk. However, the evidentiary record, viewed in the light most favorable to plaintiff, suggests that James was in fact exposed to a wide variety of petroleum-based products from the petroleum defendants, including, among others, gasoline of varying grades, motor oil, and black oil, all of which contained some measure of benzene and/or PAHs. The toxicologist's report presents considerable scientific evidence of the health risk posed by intense exposure to those chemical compounds. Crediting plaintiff's proofs, the petroleum defendants' duty to warn presumably extended to most if not all petroleum-based products they shipped in 55-gallon drums.

For summary judgment purposes we must credit the testimony that James was exposed to those products at close proximity on a frequent and regular basis, and that those exposures worked cumulatively to cause James's cancer. That each of the specific petroleum products to which James was exposed may have contributed to his cancer to a greater or lesser degree than other specific petroleum products cannot become a basis for precluding the liability of the petroleum defendants for failure to warn of the dangers of all of those products. If any defendant's proofs show

that any of the gasoline and oil residues contained in the drums it had reconditioned at Bessemer could not have caused or exacerbated James's cancer, then the jury may conclude that plaintiff failed to satisfy her burden of proof with respect to that defendant's products. If plaintiff's scientific and medical proofs remain uncontroverted, the relative danger of each specific product and the relative intensity of James's exposure to each specific product would appear to be relevant not to the determination of liability in the first instance, but rather to the apportionment of liability among defendants. See *infra* at 312–313, 714 *A*.2d at 915–916. On the question of liability, we hold that plaintiff has presented sufficient evidence with regard to the petroleum defendants to survive those defendants' motions for summary judgment.

Our holding in *Becker, supra*, 138 *N.J.* at 158–61, 649 *A*.2d 613, relied on by the Law Division to support the grant of summary judgment on the ground that plaintiff could not identify the specific products that allegedly caused his cancer, is distinguishable. The plaintiff in *Becker* alleged that his mesothelioma was caused by exposure to brake dust containing chrysotile-asbestos fibers. *Id.* at 148–49, 649 *A*.2d 613. The trial court ruled as a matter of law that all asbestos-containing friction products without a warning are defective, and so instructed the jury. *Id.* at 149, 649 *A*.2d 613. The plaintiff's expert testified that chrysotile asbestos contained in brake dust can cause mesothelioma. *Id.* at 158, 649 *A*.2d 613. However, the defense experts opined that chrysotile asbestos, as opposed to amphibole asbestos, does not cause mesothelioma and that used-brake dust contains chrysolite only in amounts tolerated under established safety standards. *Ibid.* We held that in view of that disagreement, "the trial court should have permitted the jury to resolve the disputed issue of fact in respect of the dangers of the asbestos involved in this case...." *Id.* at 158–59, 649 *A*.2d 613. We then proceeded to explain why risk-utility analysis in an asbestos-exposure case should focus on the specific product before the court, explaining that asbestos products are not uniformly harmful and thus should

not be treated by courts as a monolithic group. *Id.* at 159–61, 649 *A*.2d 613.

In contrast, plaintiff here alleges that James was exposed to a variety of different petroleum-based products manufactured by the petroleum defendants. Plaintiff's toxicologist's report indicates that all of those products contain benzene and PAHs, and that any exposure to those chemicals would have contributed, cumulatively, to James's cancer. Plaintiff is not seeking to impose, and our holding today does not invoke, market-share or alternative theories of liability. See *id.* at 160–62, 649 *A*.2d 613. Liability will attach only with respect to defendants to whose products plaintiff can prove James was frequently, regularly and proximately exposed. Furthermore, this appeal arose from an order granting summary judgment. We do not hold as a matter of law that every petroleum-based product to which James was exposed was defective, required a warning, or was capable of causing James's stomach and liver cancer. We hold only that plaintiff's proofs on those questions present disputed issues of material fact and therefore preclude a determination on motion for summary judgment that the petroleum defendants are not liable for failure to warn of the potential hazards of exposure to their products as a matter of law.

Plaintiff's evidence implicating the chemical defendants is far less developed. The toxicologist's report focused almost exclusively on benzene and PAHs found in petroleum products. There is little in the deposition testimony and statements of James's coworkers and Bessemer executives linking any of the chemical defendants to products containing known carcinogens, and limited evidence establishing the intensity of James's occupational exposure to the products of any of those defendants.

However, with the exception of American Cyanamid Company, plaintiff has not yet engaged in extensive discovery with regard to the manufacturers of non-petroleum-based products and chemicals that supplied either drums for reconditioning or products for use in the reconditioning process. Summary judgment in favor of American Cyanamid Company was affirmed by the court below on

the ground that plaintiff uncovered "no evidence showing that any formaldehyde drums sent by American Cyanamid to Kingsland were ever transferred to Bessemer for reconditioning." *James, supra,* 301 *N.J.Super.* at 541, 694 *A.*2d 270. Because plaintiff did not cross-petition this Court for certification of the Appellate Division's holding affirming summary judgment in favor of American Cyanamid Company, we do not address the propriety of that holding. With regard to the Law Division's order of summary judgment in favor of the other named chemical defendants, reversed by the Appellate Division, we hold that summary judgment was premature. See *Velantzas v. Colgate–Palmolive Co.,* 109 *N.J.* 189, 193, 536 *A.*2d 237 (1988)(finding it "especially inappropriate" to grant summary judgment when discovery is incomplete and " 'critical facts are peculiarly within the moving party's knowledge' ")(quoting *Martin v. Educational Testing Serv., Inc.,* 179 *N.J.Super.* 317, 326, 431 *A.*2d 868 (Ch.Div.1981)); *James, supra,* 301 *N.J.Super.* at 541–44, 694 *A.*2d 270 (discussing procedural history resulting in plaintiff's failure to conduct significant discovery with regard to defendants North American Paint, Daicolor–Pope and MacArthur). Plaintiff should be permitted to receive answers to interrogatories, take depositions or request document production from those defendants. With the exception of limited discovery from Occidental Corporation, plaintiff has not yet obtained discovery from the chemical defendants, some of whom had not even served their answers in this action when they were included in the Law Division's order granting summary judgment. Plaintiff should be given a reasonable time within which to conduct discovery and obtain a report from an expert regarding whether exposure to products of those defendants contributed to James's cancer, after which a renewed motion for summary judgment on behalf of the chemical defendants may be considered in the context of our holding today.

## IV

None of the parties to this action have challenged before this Court the holding of the Appellate Division with regard to

joint and several liability or the burden of apportioning liability among defendants. See *James, supra,* 301 *N.J.Super.* at 537–39, 694 *A.*2d 270. We do not depart from the holding or reasoning of the Appellate Division, but add the following observations. Plaintiff argued below, relying on *Sholtis, supra,* 238 *N.J.Super.* at 27, 568 *A.*2d 1196, that the petroleum defendants should be held jointly and severally liable and that the burden to apportion liability should shift to those defendants. We note that the Legislature specifically excepted environmental tort actions from the recent amendments to the Comparative Negligence Act providing that only a tortfeasor found to be sixty percent or more responsible for the total damages will be liable to the plaintiff for the full amount of the damages. *N.J.S.A.* 2A:15–5.3. In environmental tort actions, joint and several liability was preserved, "except in cases where the extent of negligence or fault can be apportioned." *N.J.S.A.* 2A:15–5.3d(1).[3] In so providing, the Legislature clearly recognized the difficulty of apportioning fault among concurrent tortfeasors in actions where the plaintiff's injury was caused by exposure to toxic substances.

The court in *Sholtis, supra,* 238 *N.J.Super.* at 26–28, 568 *A.*2d 1196, again adopting the reasoning of the Fifth Circuit Court of Appeals in *Borel, supra,* 493 *F.*2d at 1094, held that "where there has been 'strong circumstantial evidence' of exposure to all of the defendants' products 'on many occasions,' either the simultaneous or cumulative negligence resulted in joint liability, unless the defendants could better apportion their responsibility." The court found that in a case of cumulative injury, there was "no antipathy in New Jersey" to the shifting of the burden of apportioning liability among concurrent tortfeasors to the defendants. *Id.* at 28 (citing *Fosgate v. Corona,* 66 *N.J.* 268, 272–73, 330 *A.*2d 355 (1974)). In view of the Legislature's choice to preserve joint and

---

[3] In environmental tort actions where it is possible for the trier of fact to apportion negligence or fault pursuant to *N.J.S.A.* 2A:15–5.2, the percentage of compensatory damages that the plaintiff may recover from each tortfeasor is governed by *N.J.S.A.* 2A:15–5.3d(2) and (3).

several liability in environmental tort actions except where fault can be apportioned, we conclude that in such cases the shifting of the burden of apportionment to the defendants is consonant with New Jersey law and with the Comparative Negligence Act.

In apportioning fault among the various defendants whose products have been deemed substantial factors in causing James's cancer such that liability would attach, each defendant may seek to reduce its individual percentage of fault by submitting proof that its products to which James was exposed were less carcinogenic than the other products to which James was exposed, or that James's exposure to its products was more limited than his exposure to other products. Because the burden of apportioning fault will lie with those defendants, if any, found liable for James's illness and wrongful death, plaintiff's cause of action does not require that she be able to advance proof regarding the relative carcinogenicity of the many specific products to which James was exposed, or of the relative intensity of James's exposure to any specific product. Plaintiff need only establish medical causation with respect to each defendant in accordance with this opinion. See *supra* at 305–311, 714 *A*.2d at 912–915.

V

In addition to their inclusion in the Law Division's order granting summary judgment to all named defendants, Chevron and Texaco filed motions to dismiss plaintiff's complaint pursuant to *R.* 4:4–1 and *R.* 4:37–2(a) for insufficiency of service of process. Those motions were granted by the court on August 24, 1994. The Law Division, however, granted those motions without prejudice to plaintiff refiling her complaint. The Appellate Division reversed, remanding for an evidentiary hearing to determine "whether in fact Chevron and Texaco were prejudiced by the untimely issuance of the summonses." *James, supra,* 301 *N.J.Super.* at 546, 694 *A*.2d 270. Because of its disposition, the court did not address Chevron's contention that the Law Division should

have dismissed the complaint with prejudice. *Id.* at 547, 694 *A.*2d 270.

Although plaintiff filed her complaint against Chevron, Texaco and other defendants on February 7, 1992, Chevron was not served with a summons until April 8, 1994, and Texaco not until May 18, 1994. The Law Division initially denied Chevron's and Texaco's joint motion to dismiss for untimeliness of service, but indicated that those parties could renew the motion if they could show prejudice because of the loss or destruction of crucial evidence by Bessemer and Kingsland between the date the complaint was filed and the date that process was served. Determining that the corporate records of Bessemer and Kingsland were destroyed after Bessemer and Kingsland ceased operations in approximately June 1992, Chevron and Texaco renewed their motion to dismiss. That motion was then granted by the Law Division, which entered an order dismissing plaintiff's complaint against Chevron and Texaco without prejudice.

*Rule* 4:4–1 states:

The plaintiff, his attorney or the clerk of the court may issue the summons. If a summons is not issued within 10 days after the filing of the complaint the action may be dismissed in accordance with *R.* 4:37–2(a). Separate or additional summonses may issue against any defendants.

*Rule* 4:37–2(a) states:

For failure of the plaintiff to cause a summons to issue within 10 days after filing the complaint or to comply with these rules or any order of court, the court in its discretion may on defendant's motion dismiss an action or any claim against him. Such a dismissal shall be without prejudice unless otherwise specified in the order.

Although we have stated that "[t]he decision whether to dismiss with or without prejudice is reposed in the sound discretion of the trial court," *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 346, 476 *A.*2d 250 (1984), we stressed that "dismissal is reserved for those situations where 'no lesser sanction will erase the prejudice suffered by the non-delinquent party.'" *Olds v. Donnelly,* 150 *N.J.* 424, 438–39, 696 *A.*2d 633 (1997)(quoting *Crispin, supra,* 96 *N.J.* at 345, 476 *A.*2d 250). Although the Court in *Crispin* stressed the severity of dismissal with prejudice, we indicated

more recently in *Olds* that the issue of prejudice to the non-delinquent party arises whenever a defendant seeks dismissal pursuant to *R.* 4:4–1. We explained in *Olds, supra,* 150 *N.J.* at 438, 696 *A.*2d 633, that "[g]enerally, a violation of the ten-day rule will not result in dismissal of an action when the defendant is not prejudiced, the complaint appears meritorious, and the failure to make proper service is attributable solely to the neglect of the plaintiff's attorney."

Here, plaintiff's complaint appears meritorious, and the failure to make proper service is attributable solely to the neglect of the plaintiff's attorney, not to the plaintiff herself. Therefore, the Law Division should not have dismissed plaintiff's complaint against Chevron and Texaco "in the absence of demonstrable prejudice." *State v. One 1986 Subaru,* 120 *N.J.* 310, 315, 576 *A.*2d 859 (1990). We agree with the Appellate Division that the Law Division's finding of prejudice to Chevron and Texaco was not demonstrated sufficiently on the record to justify the dismissal of plaintiff's complaint. As the court below explained:

> The problem is that the certifications of Klein and Richard, Bessemer's president and environmental officer, respectively, relied on by the motion judge, did not indicate the time frame for the documents Bessemer allegedly destroyed. It appears from the certifications that the records were destroyed sometime between June 1992 and January 26, 1994. The records destroyed, however, were only for a limited period of time. Klein testified in his deposition that the records destroyed after June 1992 only covered the period beginning in 1990. Thus, there is an open question whether the records destroyed during the delay in service were relevant to the time periods of James' employment. There is therefore a question whether Chevron and Texaco were really prejudiced by the destruction of those records. In other words, the truly pertinent records may have been destroyed *before* plaintiff had filed her original complaint in 1992.
>
> [*James, supra,* 301 *N.J.Super.* at 545, 694 *A.*2d 270.]

In view of the uncertainty regarding whether Chevron and Texaco were prejudiced by the untimely service of process, the Appellate Division was correct to remand for an evidentiary hearing. Although an evidentiary hearing on the issue of prejudice is not mandated whenever a complaint is dismissed, "courts have required an evidentiary hearing where the record before the trial court has not provided an adequate basis for a fully informed

determination of the underlying issue. . . ." *Abtrax Pharmaceuticals, Inc. v. Elkins–Sinn, Inc.*, 139 *N.J.* 499, 518–19, 655 *A.*2d 1368 (1995).

As recognized by the Appellate Division, it is possible that an evidentiary hearing will reveal that records going to the heart of the "frequency, regularity and proximity" test were destroyed between the date plaintiff filed her complaint and the dates Chevron and Texaco were served with summonses. *James, supra,* 301 *N.J.Super.* at 545, 694 *A.*2d 270. If that is the case, dismissal of plaintiff's complaint with prejudice against Chevron and Texaco may be warranted. We recognized in *Crispin, supra,* 96 *N.J.* at 345, 476 *A.*2d 250, that "delay that so prejudices a defendant that his ability to defend the case is seriously impaired will call for dismissal with prejudice." However, if the records relating to the time period of James's employment were destroyed prior to February 1992, then plaintiff's complaint against Chevron and Texaco should be preserved.

## VI

The judgment of the Appellate Division is affirmed. We remand this action to the Law Division for further proceedings consistent with this opinion and with the opinion of the Appellate Division.

*For affirmance and remandment*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, STEIN, and COLEMAN—6.

*Opposed*—None.